14 P.3d 133 (2000)
142 Wash.2d 543
JOKING COUNTY, Respondent,
v.
CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, an agency of the State of Washington, Defendant, and
Upper Green Valley Preservation Society; Hollywood Hill Association; Robert E. Tidball (d/b/a T & M Berry Farm); Preserve Land for Agriculture Now; and Puget Sound Farm Trust, Appellants, and
Jun and Shelley Akutsu; City of Woodinville; Woodinville Fire & Life Safety District; Michael J. Alberg, Thomas A. Alberg, Kay L. Alberg; and Novelty Neighbors, Defendants, and
Northshore Youth Soccer Association; Pro Parks; Woodinville Little League; Woodinville West Little League; Bothell North Little League; and Northshore Little League, Respondents.
No. 68284-4.
Supreme Court of Washington, En Banc.
Argued May 31, 2000.
Decided December 14, 2000.
*134 Christine Gregoire, Atty. Gen., Alan Copsey, Michael Lufkin, Asst. Attys. Gen., amicus curiae on behalf of State of Wash.
Helsell, Fetterman, Peter Eglick, Jane Kiker, Reed, McClure, Darrell Mitsunaga, Hilary Franz, Robert Johns, Seattle, Christine Gregoire, Atty. Gen., Marjorie Smitch, Asst. Atty. Gen., Olympia, Brian Snure, Des Moines, for Appellant.
Herbert Sorg, Glenn Amster, Norm Maleng, King County Prosecutor, H. Kevin *135 Wright, Deputy, Peter Ramels, Deputy, John Keegan, Jeffrey S. Weber, Seattle, for Respondent.
IRELAND, J.
In this case, we must determine whether 1997 amendments to King County's comprehensive plan and zoning code, which allow active recreational uses on properties located within a designated agricultural area, violate the Growth Management Act. We hold that the amendments do not comply with the Act and that the land in question does not qualify for innovative zoning techniques under RCW 36.70A.177.

BACKGROUND
The Growth Management Act (GMA or Act), chapter 36.70A RCW, was enacted in 1990 and 1991 "in response to public concerns about rapid population growth and increasing development pressures in the state, especially in the Puget Sound region."[1] The GMA requires local governments, such as King County (County), to adopt comprehensive growth management plans and development regulations in accordance with the Act's provisions. RCW 36.70A.040.
The Act creates three growth management hearings boards for the state. The Central Puget Sound Growth Management Hearings Board, with jurisdiction in King, Pierce, Snohomish, and Kitsap Counties, has authority in this case. RCW 36.70A.250(1).
Each board consists of three members "qualified by experience or training in matters pertaining to land use planning and residing within the jurisdictional boundaries of the applicable board." RCW 36.70A.260(1). At least one member of each board must be admitted to practice law in this state, and at least one member must have been a city or county elected official. Id. The growth management hearings boards are charged with adjudicating GMA compliance. RCW 36.70A.280(1)(a).

FACTS
In 1994, King County adopted a new comprehensive plan pursuant to the GMA. The comprehensive plan designated agricultural lands in areas called Agricultural Production Districts (APDs). Approximately 40,500 acres of landabout three percent of the County's 1.4 million acreswas set aside in four APDs (Snoqualmie Valley, Enumclaw Plateau, Sammamish Valley, and Lower Green River Valley).
Since that time, there has been a growing demand for soccer and baseball fieldswhich the County's comprehensive plan terms "active recreational facilities"in the Northshore community planning area of unincorporated King County. To meet the demand, the Northshore Youth Soccer Association (N.Y.SA) proposed that the County acquire several parcels of land for development into new athletic facilities, to be known collectively as South Gateway Park. These properties (the Kaplan, Zante, Brown, Murray, Murray, and Moore properties) encompass more than 40 acres in the north end of the Sammamish Valley APD. The properties contain prime agricultural soils.
In December of 1996, NYSA agreed to purchase the Kaplan property for $960,000.[2] NYSA assigned its purchase and sale agreement for the Kaplan property to the County with the provision that the County contribute $750,000 of the purchase price. The sale closed on April 15, 1997.
The County then committed to enter into a 30 year concession agreement with NYSA for the management of new athletic facilities on *136 the Kaplan property. The County further agreed that the final concession agreement would contain a provision "to automatically extend the agreement to adjacent parcels that may be added to the park in the years to come specifically for soccer use." Clerk's Papers (CP) at 1100.
At the time the Kaplan property was acquired, the County's comprehensive plan discouraged active recreational uses within the APDs, and the County's zoning code prohibited active recreational facilities in agricultural areas. In order to develop the Kaplan property into athletic fields, the County decided to amend its comprehensive plan and zoning code to allow active recreation in the APDs.[3] The County's 1997 amendments to its comprehensive plan (Ordinance No. 12927) and its zoning code (Ordinance No. 12930), which allow limited placement of athletic fields in the APDs, are at issue in this case.
Comprehensive Plan Amendment
The County's amendment to its comprehensive plan (shown in legislative style) reads as follows:
RL (Resource Lands)-308
When new parks or trails are planned for areas within or adjacent to Agricultural Production Districts, King County should work with farmers to minimize impacts to farmland and agricultural operations. Active recreational facilities ((should)) shall not be located within Agricultural Production Districts, except under the following circumstances:
A. the property within the APD has been purchased with funds that were earmarked for recreation, and the purchase pre-dates designation of the APD, or
B. there is a transfer of uses between a property purchased consistent with subsection A and other properties within the same APD.
Under the limited circumstances in which active recreational facilities are allowed in the APD, activities and site improvements shall be limited in order to allow the future use of the property for agricultural purposes when the recreational use is abandoned. ((When new parks or trails are planned for areas within or adjacent to Agricultural Production Districts, King County should work with farmers to minimize impacts, to farmland and agricultural operations.))
Specifically, the amendment allows properties within APDs, which were purchased prior to APD designation with Forward Thrust or Interagency Committee for Outdoor Recreation (IAC) funds, to be developed for active recreational facilities.[4]
Such properties can also transfer their active recreational use to any other parcels within the same APD. The Hmong property, located in the Sammamish Valley APD, was among those identified as being purchased with Forward Thrust/IAC funds.[5] The Kaplan, Zante, Brown, Murray, Murray, and Moore properties are also affected because the amendments transfer the recreational use from the Hmong property to these properties. The amendments do not limit the number of acres of agricultural land that can be converted to recreational use by receiving a transfer of such use from the Hmong property.[6]
*137 Zoning Code Amendment
The County's amendment to its zoning code (development regulations), with new language underlined, reads as follows:
K.C.C. 21A.08.040.B.1
d. Facilities in the F [Forest], A [Agriculture], or M [Mineral] zones, or in a designated Rural Farm or Forest District, shall be limited to trails and trail-heads and active recreation facilities, including related accessory uses such as parking and sanitary facilities. Active recreation facilities shall be limited to those properties within the Agricultural Production District (APD) that are acquired prior to designation of the APD, using voter-approved recreation funds, state funds mandated for recreation, or King County Board of Recreation funds. Active recreation uses allowed on parcels as noted above m[a]y be transferred to other parcels within the same APD. However, active recreation from lands outside of the APD shall not be relocated to any parcel within an APD. Where such facilities are permitted within an APD, the following deed restrictions will be applied:
(1) Active recreation uses shall be designed in a manner that visually screens adjacent agricultural uses from park users and that restricts physical trespass onto adjacent Agricultural Production District properties;
(2) Buildings associated with recreational uses shall be limited to restroom facilities, picnic shelters and storage/maintenance facilities for equipment used onsite;
(3) No use that permanently compacts, removes, sterilizes, pollutes or otherwise materially impairs the future use of the soil for raising agricultural crops shall be allowed;
(4) Any soil surfaces temporarily disturbed through construction activities shall be restored in a manner consistent with agricultural uses, including restoration of the original soil horizon sequence, as soon as practical following such disruptions;
(5) Access to recreational uses shall be designed to minimize impact on the surrounding Agricultural Production District and should be limited to direct access along District boundaries whenever feasible; and
(6) Although the recreational use of Agricultural Production District properties may be long term, such use shall be recognized as an interim use of the Production District's prime agricultural soils. As such, any acquisition funding or policy restrictions for the recreational use of the property shall be viewed as subordinate to the County's prior commitment to the preservation of prime agricultural soils and the viability of local agricultural production. Whenever the County declares through action of the King County Council a critical shortage of agricultural soils to accommodate an active soil-dependent agricultural proposal, the County shall initiate a process to relocate any recreational uses off the subject property, and to make the property available for re-establishment of agricultural activities.
This amendment allows active recreational facilities within APDs. The amendment details the specific conditions under which such facilities must be constructed and operated, including visual screening between recreational facilities and adjacent agricultural uses, limitations on buildings, and limitations designed to preserve the soil for future agricultural use. The amendment recognizes that active recreational use within the APDs is "interim" and "subordinate to the County's prior commitment to the preservation of prime agricultural soils and the viability of local agricultural production." Under the amendment, if the County declares a critical shortage of land to accommodate an "active *138 soil-dependent agricultural proposal," it must "initiate a process" to remove recreational uses from the needed property.

PROCEDURAL HISTORY
Appellants[7] first appealed the County's comprehensive plan amendment and zoning code amendment to the Central Puget Sound Growth Management Hearings Board (Board). In a 2-to-1 decision, the Board found that the challenged amendments, which would allow active recreation on designated agricultural lands, do not comply with the requirements of RCW 36.70A.020(8),.060, .170, and .177. The Board held the challenged amendments to be invalid because they substantially interfere with fulfillment of the natural resource industries planning goal, RCW 36.70A.020(8). The Board directed the County to repeal the amendments.
The County and several youth sports organizations, which were intervenors in the Board appeal,[8] sought review in King County Superior Court. The superior court reversed the Board's decision, holding that the amendments were permitted as "innovative zoning techniques" within the scope of RCW 36.70A.177.
Appellants were granted direct review by this Court. Whether the County's action to allow athletic fields in a designated agricultural district complies with the GMA is an issue of first impression.

ANALYSIS
Standard of Review
The Board is charged with adjudicating GMA compliance, and, when necessary, with invalidating noncompliant comprehensive plans and development regulations. RCW 36.70A.280, .302. The Board "shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3). To find an action "clearly erroneous," the Board must be "left with the firm and definite conviction that a mistake has been committed." Dep't of Ecology v. Pub. Util. Dist. 1, 121 Wash.2d 179, 201, 849 P.2d 646 (1993).
A party aggrieved by a final Board decision may appeal the decision to superior court as provided in chapter 34.05 RCW, the Administrative Procedure Act (APA). RCW 36.70A.300(5). In judicial review under the APA, "[t]he burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).
Because the County asserts the invalidity of the Board's order in an adjudicative proceeding, the applicable standards for granting relief are found in RCW 34.05.570(3). That subsection sets out nine standards, of which the County asserts the following two:
(d) The agency has erroneously interpreted or applied the law;
(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter[.]
RCW 34.05.570(3)(d) and (e).
On appeal, this court reviews the Board's decision, not the decision of the superior court, and "judicial review of the Board's decision is based on the record made before the Board." Buechel v. Dep't of Ecology, 125 Wash.2d 196, 202, 884 P.2d 910 (1994). "We apply the standards of RCW 34.05 directly to the record before the agency, sitting in the same position as the superior court." City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 45, 959 P.2d 1091 (1998).
*139 The burden of demonstrating that the Board erroneously interpreted or applied the law, or that the Board's order is not supported by substantial evidence, remains on the party asserting the errorin this case, on the County and the sports organizations. RCW 34.05.570(1)(a).
This court reviews the Board's legal conclusions de novo, giving substantial weight to the Board's interpretation of the statute it administers. Diehl v. Mason County., 94 Wash.App. 645, 652, 972 P.2d 543 (1999). In reviewing the agency's findings of fact under RCW 34.05.570(3)(e), the test of substantial evidence is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." Callecod v. Wash. State Patrol, 84 Wash.App. 663, 673, 929 P.2d 510 (1997).
The Board's Position
In the Board's view, several GMA provisions combine to explain the Act's requirements to conserve agricultural lands:
Read together, .020(8), .030(2), .030(10),.170, and .060 reveal the GMA's designto maintain and enhance the agricultural industry by assuring the conservation of agricultural lands of long-term commercial significance, and preventing interference with agricultural activities by nearby non-agricultural land uses.
CP at 20. The Board held that these provisions of the Act, when read together, "create an agricultural conservation imperative that imposes an affirmative duty on local governments to designate and conserve agricultural lands to assure the maintenance and enhancement of the agricultural resource industry." CP at 22. The Board held that the County's amendments conflict with this imperative and thus violate the Act.
The Superior Court's Position
The superior court disagreed with the Board. The court noted that encouraging the retention of open space and development of recreational opportunities is also a goal of the GMA, and the Act does not rank the goals in importance. In the court's view, the Act "grants broad discretion to the local jurisdiction to balance the planning goals `in full consideration of local circumstances.'" CP at 43.
Unlike the Board, the superior court was persuaded that a 1997 amendment to the GMA by the Legislature supports the County's amendments to its comprehensive plan and development regulations. It was the court's view that the County's decision to locate athletic fields in the APD is "an innovative zoning technique that will conserve agricultural lands and encourage the agricultural economy." CP at 45.
In short, the superior court held as follows:
The Board erred in finding "an agricultural conservation imperative" in RCW 36.70A.020(8), .060, and .170, that overrode the 1997 amendment to the Growth Management Act. The County's comprehensive plan and zoning code amendments were within the scope of RCW 36.70A.177 and should have been upheld.
CP at 46.
Statutory Interpretation
Both sides argue that resolution of this case is fundamentally a matter of statutory interpretation. "On questions of statutory interpretation the Supreme Court is the final arbiter." Nat'l Elec. Contractors Ass'n v. Riveland, 138 Wash.2d 9, 19, 978 P.2d 481 (1999). The court's interpretation of a statute is inherently a question of law, and the court reviews questions of law de novo. Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd., 131 Wash.2d 345, 352, 932 P.2d 158 (1997). "The primary goal in statutory interpretation is to ascertain and give effect to the intent of the Legislature." Nat'l Elec. Contractors Ass'n, 138 Wash.2d at 19, 978 P.2d 481. In order to determine legislative intent, the court begins with the statute's plain language and ordinary meaning. Id.
In the view of appellants in this case, the GMA requires the preservation of productive agricultural land and does not allow such land to be diverted to nonagricultural uses. On the other hand, respondents believe that the Act, and particularly RCW 36.70A.177, grant local governments the flexibility to allow some nonagricultural uses of agricultural *140 lands in order to meet local demands. The following sections provide analyses of (1) the GMA's treatment of agricultural land and recreational facilities, and (2) the scope of RCW 36.70A.177.
1. Agricultural Land and Recreational Facilities
"In seeking to address the problem of growth management in our state, the Legislature paid particular attention to agricultural lands." City of Redmond, 136 Wash.2d at 47, 959 P.2d 1091.
Several provisions of the GMA directly address agricultural lands. Even before counties were obligated to adopt comprehensive plans in compliance with the Act, the GMA required counties to designate agricultural lands for preservation:
On or before September 1, 1991, each county, and each city, shall designate where appropriate:
(a) Agricultural lands that are not already characterized by urban growth and that have long-term significance for the commercial production of food or other agricultural products[.]
RCW 36.70A.170(1)(a). The County was required to designate agricultural lands of long-term commercial significance.[9]
Once agricultural lands had been designated, the Act also required counties and cities to adopt development regulations to assure the conservation of the designated lands:
Each county that is required or chooses to plan under RCW 36.70A.040, and each city within such county, shall adopt development regulations on or before September 1, 1991, to assure the conservation of agricultural, forest, and mineral resource lands designated under RCW 36.70A.170.... Such regulations shall assure that the use of lands adjacent to agricultural, forest, or mineral resource lands shall not interfere with the continued use, in the accustomed manner and in accordance with best management practices, of these designated lands for the production of food, agricultural products, or timber, or for the extraction of minerals.
RCW 36.70A.060(1). The County was required to assure the conservation of agricultural lands and to assure that the use of adjacent lands does not interfere with their continued use for the production of food or agricultural products.
The Act provides the following "natural resource industries" goal to guide the development of comprehensive plans and development regulations:
Maintain and enhance natural resource-based industries, including productive timber, agricultural, and fisheries industries. Encourage the conservation of productive forest lands and productive agricultural lands, and discourage incompatible uses.
RCW 36.70A.020(8). The County is to conserve agricultural land in order to maintain and enhance the agricultural industry and to discourage incompatible uses.
Recreation is also addressed in several provisions of the GMA. The Act requires local governments to identify lands useful for public purposes:
Each county and city that is required or chooses to prepare a comprehensive land use plan under RCW 36.70A.040 shall identify lands useful for public purposes such as utility corridors, transportation corridors, landfills, sewage treatment facilities, storm water management facilities, recreation, schools, and other public uses.
RCW 36.70A.150. The County is to identify lands useful for public purposes such as recreation.
*141 In addition, the Act requires identification of open space corridors:
Each county and city that is required or chooses to prepare a comprehensive land use plan under RCW 36.70A.040 shall identify open space corridors within and between urban growth areas. They shall include lands useful for recreation, wildlife habitat, trails, and connection of critical areas as defined in RCW 36.70A.030.
RCW 36.70A.160. The County is to identify open space corridors that include lands useful for recreation. Recreational facilities, as contemplated in the County's comprehensive plan and development regulations, are "public facilities" under the Act. RCW 36.70A.030(12).[10]
The Act provides the following "open space and recreation" goal to guide the development of comprehensive plans and development regulations:
Encourage the retention of open space and development of recreational opportunities, conserve fish and wildlife habitat, increase access to natural resource lands and water, and develop parks.
RCW 36.70A.020(9). The County is to encourage the development of recreational opportunities.
In summary, the agricultural lands provisions (RCW 36.70A.020(8), .060, and .170) direct counties and cities (1) to designate agricultural lands of long-term commercial significance; (2) to assure the conservation of agricultural land; (3) to assure that the use of adjacent lands does not interfere with their continued use for agricultural purposes; (4) to conserve agricultural land in order to maintain and enhance the agricultural industry; and (5) to discourage incompatible uses. The recreation provisions (RCW 36.70A.020(9), .150, and .160) direct counties and cities (1) to identify lands useful for recreation; (2) to identify open space corridors; and (3) to encourage the development of recreational opportunities.
The GMA's plain language and ordinary meanings are critical to interpreting these provisions. Contrast the requirements that counties and cities identify lands useful for recreation and encourage the development of recreational opportunities with the requirements that local governments designate agricultural land and conserve such land in order to maintain and enhance the agricultural industry. Although the planning goals are not listed in any priority order in the Act, the verbs of the agricultural provisions mandate specific, direct action. The County has a duty to designate and conserve agricultural lands to assure the maintenance and enhancement of the agricultural industry.
Interpreting the Act as the County proposes would result in a net loss of designated agricultural land. The County's interpretation fails to give effect to the Legislature's stated intent to conserve such land in order to maintain and enhance the agricultural industry. The Redmond court quoted with approval the observation that:
"Natural resource lands are protected not for the sake of their ecological role but to ensure the viability of the resource-based industries that depend on them. Allowing conversion of resource lands to other uses or allowing incompatible uses nearby impairs the viability of the resource industry."
City of Redmond, 136 Wash.2d at 47, 959 P.2d 1091, (quoting Richard L. Settle & Charles G. Gavigan, The Growth Management Revolution in Washington: Past, Present, and Future, 16 U. PUGET SOUND L.REV. 867, 907 (1993)).
2. RCW 36.70A.177Innovative Zoning Techniques
In 1997, the Legislature added the following provision to the GMA:
(1) A county or a city may use a variety of innovative zoning techniques in areas designated as agricultural lands of long-term commercial significance under RCW *142 36.70A.170. The innovative zoning techniques should be designed to conserve agricultural lands and encourage the agricultural economy. A county or city should encourage nonagricultural uses to be limited to lands with poor soils or otherwise not suitable for agricultural purposes.
(2) Innovative zoning techniques a county or city may consider include, but are not limited to:
(a) Agricultural zoning, which limits the density of development and restricts or prohibits nonfarm uses of agricultural land;
(b) Cluster zoning, which allows new development on one portion of the land, leaving the remainder in agricultural or open space uses;
(c) Large lot zoning, which establishes as a minimum lot size the amount of land necessary to achieve a successful farming practice;
(d) Quarter/quarter zoning, which permits one residential dwelling on a one-acre minimum lot for each one-sixteenth of a section of land; and
(e) Sliding scale zoning, which allows the number of lots for single-family residential purposes with a minimum lot size of one acre to increase inversely as the size of the total acreage increases.
RCW 36.70A.177.
Because the Act does not specifically define the term "innovative zoning techniques," we again begin statutory interpretation with the ordinary meaning of the wordsharmonizing the new provision by reading it in context with the existing provisions discussed above:
We are required to read legislation as a whole, and to determine intent from more than a single sentence. Effect should be given to all of the language used, and the provisions must be considered in relation to each other, and harmonized to ensure proper construction.
King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 91 Wash.App. 1, 16, 951 P.2d 1151 (1998) (footnote omitted), aff'd. in part, rev'd in part on other grounds by 138 Wash.2d 161, 979 P.2d 374 (1999).
In order to constitute an innovative zoning technique consistent with the overall meaning of the Act, a development regulation must satisfy the Act's mandate to conserve agricultural lands for the maintenance and enhancement of the agricultural industry.
The trial court erroneously found that the County's amendments qualified as an "innovative zoning technique" under RCW 36.70A.177. The statute encourages counties to limit innovative techniques "to lands with poor soils or otherwise not suitable for agricultural purposes." The trial court found this requirement "discretionary" rather than "mandatory" because the statute uses the word "should." This interpretation misplaces the discretion. The word "should" applies to "encourage nonagricultural uses." The phrase "limited to lands with poor soils" is a qualifying phrase for "nonagricultural uses." The discretion is applied to "encouraging nonagricultural uses," not to the land eligible for such encouraged uses. Read logically, this phrase means that the County may encourage nonagricultural uses where the soils are poor or the land is unsuitable for agriculture. It should not be read that the County may encourage nonagricultural uses whether or not the soils are poor or unsuitable for agriculture. The evidence does not support a finding that the subject properties have poor soils or are otherwise not suitable for agricultural purposes. Therefore, the properties in this case do not qualify for "innovative zoning techniques."
"Local governments have broad discretion in developing [comprehensive plans] and [development regulations] tailored to local circumstances." Diehl, 94 Wash. App. at 651, 972 P.2d 543. Local discretion is bounded, however, by the goals and requirements of the GMA. In reviewing the planning decisions of local governments, the Board is instructed to recognize "the broad range of discretion that may be exercised by counties and cities consistent with the requirements of this chapter" and to "grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of this chapter." RCW 36.70A.3201 (emphasis added).
*143 The County has broad discretion to develop a comprehensive plan and development regulations that are suited to its local circumstances. However, the County's proposed action to convert agricultural land to active recreation does not appear in any of the Act's suggested zoning techniques. After properly designating agricultural lands in the APD, the County may not then undermine the Act's agricultural conservation mandate by adopting "innovative" amendments that allow the conversion of entire parcels of prime agricultural soils to an unrelated use. The explicit purpose of RCW 36.70A.177 is to provide for creative alternatives that conserve agricultural lands and maintain and enhance the agricultural industry.

CONCLUSION
The soils of the Sammamish Valley APD have the unique characteristics of prime farmland. The APD includes some of the most productive agricultural land in the state, but it is also among the areas most impacted by rapid population growth and development. Even though the properties in this case lie in the APD, there is pressure to convert the land to nonagricultural uses.
Through the "innovative zoning techniques" amendment, the state has attempted to provide flexibility for counties, but the amendment includes no provision for the recreational use designated here. Read as the County would read it, the amendment would work as a virtual abandonment of the APD designation.
The County argues that its amendments would allow agricultural soils to be preserved. However, the "interim" agreement with NYSA would result in a long-term removal of designated agricultural land from its availability for agricultural production. It is anticipated that the South Gateway Park would be used by tens of thousands of people. Recreational facilities would include athletic fields, parking lots, storage and maintenance facilities, restrooms, and other development necessary to accommodate players and spectators. The County's argument that the land could be returned to agricultural use at a future time, despite the intensive use demanded by the growing urban population and the profitability of that use, is unpersuasive.
When read together, RCW 36.70A.020(8),.060(1), and .170 evidence a legislative mandate for the conservation of agricultural land. Further, RCW 36.70A.177 must be interpreted to harmonize with that mandate. Nothing in the Act permits recreational facilities to supplant agricultural uses on designated lands with prime soils for agriculture.
The County's amendments, which allow active recreational uses on designated agricultural lands, do not comply with the GMA, and the land in question does not qualify for innovative zoning techniques under RCW 36.70A.177. Although the GMA encourages recreational uses of land, there is no conservation mandate for recreational use as with agricultural use. In this case, the GMA mandates conservation of the APD's limited, irreplaceable agricultural resource lands. There are still thousands of acres suitable for athletic fieldsoutside the APDs.
We hereby reverse the trial court and reinstate the Board's decision invalidating the challenged amendments.
GUY, C.J., SMITH, MADSEN, ALEXANDER, TALMADGE, SANDERS, and BRIDGE, JJ., concur.
JOHNSON, J. (dissenting).
In reaching its decision, the majority focuses almost entirely on the Growth Management Act's (GMA) directive to conserve agricultural land. This approach minimizes the other directives of the GMA and prevents local governments from utilizing the innovative techniques the GMA provides for. The majority erroneously reads the goal of protecting agricultural land in isolation from other GMA provisions, including the statutory directive to provide recreational facilities. These directives can be interpreted harmoniously, however, giving effect to each. This is exactly what King County did when it designed a plan that not only preserves the agriculture potential of the land but also provides for much needed recreational facilities. I would affirm the superior court and hold King County's plan allowing a soccer *144 field as an interim use does not violate the GMA.
The property at issue in this case is not lost to agricultural use when used for an interim soccer field. The Kaplan property has not been farmed for 30 years. Presumably, its inclusion in King County's agricultural production district was to preserve the potential for agricultural development, not to preserve current farming operations. Using the land for an interim soccer field preserves the soil while also providing for recreational uses. The county's plan includes specific guidelines to protect the soil for future agricultural use, if needed, and minimize any changes to the land.[1] In this case, the county is not turning a blind eye to the statutory directive to conserve agricultural land by developing it in a manner which would displace current agricultural use or destroy future agricultural use. Instead, the county followed all applicable statutory directives and provided an innovative method of preserving agricultural land, while at the same time addressing the paucity of soccer fields in the area.
The majority's reading of the GMA fails to give meaning to the entire statute. A statute must be considered as a whole to ensure all parts of the statutory scheme operate in harmony, and to avoid leaving any language without effect. State v. Malone, 106 Wash.2d 607, 610-11, 724 P.2d 364 (1986). The majority finds support for its conclusion by focusing narrowly on the active verbs in sections of the GMA, instead of reading the GMA as a whole. Despite the fact the statute specifically states its goals "are not listed in order of priority," RCW 36.70A.020, the majority concludes a county's duty to conserve agricultural land is a higher priority than creating recreational facilities, in essence making meaningless other provisions of the GMA. Such a is unwarranted. Although the majority discusses the GMA's goals for providing recreational uses and its flexible authority to plan, ultimately the majority finds these provisions meaningless. By focusing narrowly on certain GMA provisions to the exclusion of others, the majority violates the fundamental rule that a statute must be considered as a whole and, thus, draws an erroneous conclusion. Evidently, under the majority's approach, the only allowable use in an agricultural production district is farming, even if the land is not being used for farming. This makes no sense.
While the GMA does direct local governments to conserve agricultural land, it also instructs those same governments to provide recreational facilities. See RCW 36.70A.020(8)-(9), (12); RCW 36.70A.060; RCW 36.70A.160; RCW 36.70A.170. The GMA encourages these governments to "use a variety of innovative zoning techniques in areas designated as agricultural lands...." RCW 36.70A.177(1). The term "innovative techniques" means "a new and different way to achieve a given result." Green Valley v. King County, No. 98-3-0008c, at 17 (Central Puget Sound Growth Mgmt. Hr'gs Bd. Pinal *145 Dec. and Order July 29, 1998). The GMA does not instruct local governments as to what methods they should use to accomplish these goals. Instead, the GMA encourages flexibility and innovation. The methods chosen are within the discretion of these governments so long as they do not conflict with the GMA provisions. Consequently, this court must determine whether creating a soccer field on fallow property within an agricultural production district is an acceptable method of conserving the land for agricultural production.
A goal of the GMA is to "[e]ncourage the conservation of productive ... agricultural lands...." RCW 36.70A.020(8) (emphasis added). The GMA does not define the term "conservation" or explain what it means to conserve. "Conservation" is defined in Black's Law Dictionary as: "[t]he supervision, management, and maintenance of natural resources; the protection, improvement, and use of natural resources in a way that ensures the highest social as well as economic benefits." Black's Law Dictionary 300 (7th ed.1999). The meaning of "conserve" is "[t]o save from loss." Black's Law Dictionary 378 (rev. 4th ed.1968). In this case, it is imperative that we determine what actually is being saved from loss. This will necessarily influence our assessment of whether the county has chosen a method of conservation that violates the GMA. For example, if the land at issue was currently being farmed and the county's plan would displace this use, then the plan would contravene the GMA's goal to conserve. If, however, the county were merely conserving the agricultural potential of the land, as is the case here, any use of the land that does not destroy this potential should satisfy the GMA's mandate to conserve because there is no loss.
While the distinction between current agricultural use and the potential for such use is subtle, it is determinative in this case. King County designated several properties, including the Kaplan property, located on the north end of the Sammamish Valley as part of an agricultural production district. Not all properties were being used for agricultural purposes at the time of the designation. It is the policy of the county that agriculture be the preferred land use in the agricultural production district, but not the exclusive land use. See Policy RL-102 and Policy RL-302, 1994 King County Comprehensive Plan Complete with 1999 Updates, King County Office of Regional Policy & Planning (rev.1999), available at http://www.metrokc.gov/exec/orpp/compplan/1994_99. By including this property in the agricultural production district, the county eliminated the possibility that this land would be developed in a way that would destroy the soil and any future agricultural use. Its action, however, did not mandate that the land could only be used for farming. Indeed, the property at issue has not been farmed for 30 years. It lies fallow.
The current method of conserving the soil on the Kaplan property for future use is letting it remain as is. In its amended plan, the county chose a different method of conserving the agricultural potential of the property by placing an interim soccer field on the land. Under this plan, there is no displacement of current agricultural production or of the potential for future production on the land. There is no destruction of the soil. There is merely a change from one method of conservation to another.
The creation of an interim soccer field under the narrow guidelines of the county's plan does not harm the potential future use of the land for agriculture. The county's 1997 amendment provides strict and specific directives in order to prevent the destruction of the soil and the disturbance of those lands within the agricultural production district that are actually being farmed. More importantly, the amendment states that the field will be relocated if there is a "critical shortage of agricultural soils to accommodate an active soil-dependant agricultural proposal...." King County Code 21A.08.040(B)(1)(d)(6). Thus, the majority's assertion that the county's proposal will "result in a net loss of designated agricultural land" is incorrect. See majority at 141.
Under the terms of the plan, the county saves the soil, does not reduce any current agricultural production, and preserves the property for future cultivation, if needed. There is no loss. The plan merely enables *146 the county to swap one method of conservation (leaving the land uncultivated) for another (placing a soccer field on it). This is within the county's discretion so long as the land remains available for actual farming in the future.
By passing the 1997 amendment, the county selected its preferred method of conservation while, at the same time, met its second goal of providing recreational facilities. There is a documented need for recreational facilities in unincorporated King County. By choosing the method of conversation that it did, the county attempted to remedy this problem. King County's innovative approach to these dual concerns harmonizes multiple goals of the GMA. I would affirm the superior court's decision upholding the county's amended plan.
NOTES
[1] Alan D. Copsey, Including Best Available Science in the Designation and Protection of Critical Areas Under the Growth Management Act, 23 Seattle U.L.REV. 97 (1999).
[2] An appraisal commissioned by the County valued the Kaplan property at $375,000 if it were limited to agricultural use and $935,000 if it were annexed by the City of Woodinville and rezoned for urban use. Respondents assert that because the Kaplan property has been unfarmed for many years, it is not being removed from agricultural use by virtue of the County's amendments. The assertion is incorrect in light of the Redmond court's holding that "land is `devoted to' agricultural use under RCW 36.70A.030 if it is in an area where the land is actually used or capable of being used for agricultural production." City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Ed., 136 Wash.2d 38, 53, 959 P.2d 1091 (1998) (emphasis added).
[3] The County also had the option to remove the Kaplan property from the APD. Such removal would have necessitated replacement of the property with land abutting the APD that was of equal acreage, soils, and agricultural quality.
[4] In order to receive IAC funds, a local jurisdiction commits, through a deed of right, that property being purchased with such funds will be used for public outdoor recreation purposes.
[5] The Hmong property is a 28-acre parcel. The County leases approximately 18 acres to the Hmong Farmers Organization for active farming; the other 10 acres provide access to the Sammamish River Trail. The County's amendments were presented as necessary to "save" the Hmong farmers. Although the County asserts that its lease to the Hmong farmers violates the Forward Thrust and IAC funds' required uses, the record does not contain evidence that the use of the property has been challenged by the IAC or any agency involved in Forward Thrust implementation.
[6] Following oral argument of the case, King County moved this court to take judicial notice of a certified copy of the recorded Deed of Right to Use Land for Public Recreation Purposes for the Hmong property. Even though ER 201 states that certain facts may be judicially noticed at any stage of a proceeding, RAP 9.11 restricts appellate consideration of additional evidence on review. The County offers no justification under the RAP 9.11 criteria for its belated offer of the deed of right. Most importantly, there is no showing that the deed is needed to fairly resolve the issues on review or that the deed would probably change the decision being reviewed. Therefore, the County's motion for judicial notice is denied.
[7] Appellants include Upper Green Valley Preservation Society, Hollywood Hill Association, Robert E. Tidball (d/b/a T & M Berry Farm), Preserve Land For Agriculture Now, and Puget Sound Farm Trust.
[8] These entities, including King County, Northshore Youth Soccer Association (N.Y.SA), Parents for Recreational Opportunities and Parks (PRO Parks), Woodinville Little League, Woodinville West Little League, Bothell North Little League, and Northshore Little League, are respondents in the case now before the court.
[9] The Act defines "agricultural land" as:

land primarily devoted to the commercial production of horticultural, viticultural, floricultural, dairy, apiary, vegetable, or animal products or of berries, grain, hay, straw, turf, seed, Christmas trees not subject to the excise tax imposed by RCW 84.33.100 through 84.33.140, finfish in upland hatcheries, or livestock, and that has long-term commercial significance for agricultural production.
RCW 36.70A.030(2). "Long-term commercial significance" is to include "the growing capacity, productivity, and soil composition of the land for long-term commercial production, in consideration with the land's proximity to population areas, and the possibility of more intense uses of the land." RCW 36.70A.030(10).
[10] The Act defines "public facilities" to include: streets, roads, highways, sidewalks, street and road lighting systems, traffic signals, domestic water systems, storm and sanitary sewer systems, parks and recreational facilities, and schools.

RCW 36.70A.030(12).
[1] The county's plan, as stated in King County Code 21A.08.040(b)(1)(d), provides the following safeguards:

"(1) Active recreation uses shall be designed in a manner that visually screens adjacent agricultural uses from park users and that restricts physical trespass onto adjacent agricultural production district properties;
"(2) Buildings associated with recreational uses shall be limited to restroom facilities, picnic shelters and storage/maintenance facilities for equipment used on-site;
"(3) No use that permanently compacts, removes, sterilizes, pollutes or otherwise materially impairs the future use of the soil for raising agricultural crops shall be allowed;
"(4) Any soil surfaces temporarily disturbed through construction activities shall be restored in a manner consistent with agricultural uses, including restoration of the original soil horizon sequence, as soon as practical following such disruptions;
"(5) Access to recreational uses shall be designed to minimize impact on the surrounding agricultural production district and should be limited to direct access along district boundaries whenever feasible; and
"(6) Although the recreational use of agricultural production district properties may be long term, such use shall be recognized as an interim use of the production district's prime agricultural soils.... Whenever the County declares through action of the King County council a critical shortage of agricultural soils to accommodate an active soil-dependent agricultural proposal, the county shall initiate a process to relocate any recreational uses off the subject property and to make the property available for re-establishment of agricultural activities..."