[Nos. 67095-6-I; 67094-8-I.   Division One.   December 27, 2011.]

BD Lawson Partners, LP, et al., *Petitioners*, v. The Central Puget Sound Growth Management Hearings Board, *Defendant*, Toward Responsible Development et al., *Respondents*, The City of Black Diamond, *Petitioner*.

678

Nancy B. Rogers, Andrew S. Lane, and Randall P. Olsen (of Cairncross & Hempelmann PS), for petitioners BD Lawson Partners, LP, et al.

Bob C. Sterbank and Michael R. Kenyon (of Kenyon Dissend PLLC), for petitioner City of Black Diamond.

David A. Bricklin (of Bricklin & Newman LLP), for respondents Toward Responsible Development et al.

¶1 APPELWICK, J. — The Central Puget Sound Growth Management Hearings Board lacked jurisdiction to review the 2010 ordinances enacted by the city of Black Diamond approving the master plan development permits for Yarrow Bay. We reverse.

## FACTS

¶2 In 2009, the city of Black Diamond (City) adopted a new comprehensive plan. City of Black Diamond, Wash., Ordinance (BDO) no. 09-908 (2009). That comprehensive plan included a "Future Land Use Map," designating large areas of the City broadly for Master Planned Developments (MPDs) with an "MPD Overlay." CITY OF BLACK DIAMOND COMPREHENSIVE PLAN fig. 5-1, at 5-25 (June 2009), *available at* http://www.ci.blackdiamond.wa.us/Depts/CommDev /planning/FinalPlan_092209.pdf. The City also enacted development regulations in the form of a 2009 MPD ordinance codified in chapter 18.98 of the Black Diamond Municipal Code (BDMC). That ordinance served to "update the procedures, requirements, and standards relating to application

for, approval of, and amendment to the conditions attached to [an MPD]." BDO no. 09-897 (formatting omitted). The ordinance created an MPD zoning district (BDMC 18.98.005), set the standards and the permit process for the review of future MPD permit applications (BDMC 18.98-.060), and made generalized statements of policy (BDMC 18.98.010). *See generally* BDMC 18.98.005-.080. It broadly defined the allowable land uses in the MPDs: "MPDs shall include a mix of residential and nonresidential use. Residential uses shall include a variety of housing types and densities." BDMC 18.98.120(A). The City also adopted chapter 18.08 BDMC, which set additional procedures for processing permits. These 2009 ordinances were not appealed to the Central Puget Sound Growth Management Hearings Board (Board) under the Growth Management Act (GMA), chapter 36.70A RCW.

¶3 BD Lawson Partners LP and BD Village Partners LP (collectively Yarrow Bay) sought approval from the City to build two MPDs. All of the land in these MPDs falls within the municipal boundaries of the City, and thus within the city's urban growth area. *See* RCW 36.70A.110(1). The City concluded that the two MPD permit applications met the standards previously established in 2009 by the amended comprehensive plan policies and by chapter 18.98 BDMC. On September 20, 2010, the Black Diamond City Council approved those MPD permits by ordinance. BDO nos. 10-946, 10-947. Ordinance no. 10-946 approved the "Villages" MPD, an approximately 1,196 acre development with mixed residential and nonresidential uses. Ordinance no. 10-947 approved of the "Lawson Hills" MPD, a 371 acre development with a similar mix of uses.

¶4 A citizens group led by Toward Responsible Development (TRD) filed challenges to those 2010 MPD approval ordinances both in superior court under the Land Use Petition Act (LUPA), ch. 36.70C RCW, and with the Growth Management Hearings Board under the GMA. The LUPA case in superior court was stayed pending the GMA appeal.

¶5 In proceedings before the Board, TRD argued that the MPD approval ordinances were not project specific permits but were development regulations, and thus the Board should have jurisdiction. Yarrow Bay and the City disputed this, arguing that the ordinances were project permits consistent with the City's comprehensive plan and development regulations.[1] Both sides filed dispositive motions on the issue of the Board's jurisdiction and other matters. The Board issued its order on motions on February 15, 2011. The Board determined that the ordinances were subarea plans or development regulations, that it had jurisdiction over the MPD ordinances, and that the City's approval process did not properly follow its adopted public participation procedures for GMA amendments. It nevertheless found the continued validity of the ordinances did not represent a substantial interference with GMA goals and therefore declined to enter a determination of invalidity. The Board then remanded Ordinance nos. 10-946 and 10-947 back to the City with instructions to "take legislative action to achieve compliance with the GMA pursuant to this Order."

¶6 On February 18, 2011, Yarrow Bay filed a petition for review of agency action in superior court appealing the Board's order on motions. TRD sought a certificate of appealability from the Board in order to obtain direct review in this court. The Board issued a certificate of appealability. The parties then brought a joint motion for direct review of Yarrow Bay's appeal of the Board's order on motions, and this court granted the motion.

## STANDARD OF REVIEW

¶7 We review questions of statutory interpretation de novo. *Woods v. Kittitas County*, 162 Wn.2d 597, 607, 174 P.3d 25 (2007). A reviewing court's primary goal is to determine and give effect to the legislature's intent and purpose in creating the statute. *Id.* " '[I]f the statute's

---

[1] Yarrow Bay is the sole appellant here.

meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.' " *Id.* (alteration in original) (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 10-11, 43 P.3d 4 (2002)). We review the Board's legal conclusions de novo, giving substantial weight to the Board's interpretation of the statute it administers. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000). This court reviews hearings board decisions under the Administrative Procedure Act, which places the burden of demonstrating the invalidity of agency action on the party asserting invalidity. RCW 34.05.570(1)(a); *Feil v. E. Wash. Growth Mgmt. Hearings Bd.*, 172 Wn.2d 367, 376, 259 P.3d 227 (2011). We grant relief from the Board's decision only upon a determination that one or more of the criteria in RCW 34.05.570(3)(a)-(i) are met. *King County*, 142 Wn.2d at 552-53.

## DISCUSSION

¶8 Yarrow Bay argues the Board erred by asserting jurisdiction over the 2010 MPD approval ordinances. It contends that the Board's assumption of jurisdiction constituted an improper collateral attack on the City's 2009 comprehensive plan and development regulations. Because Yarrow Bay disputes the Board's jurisdiction, the relevant statutory basis for relief is:

> (b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law.

RCW 34.05.570(3).

■ ■ ¶9 The Board has exclusive jurisdiction to determine compliance with the GMA. *Davidson Serles & Assocs. v. City of Kirkland*, 159 Wn. App. 616, 625, 246 P.3d 822 (2011). The Board's jurisdiction is limited to deciding petitions challenging comprehensive plans, development regulations, or permanent amendments to comprehensive plans or development regulations. *Woods*, 162 Wn.2d at 609; RCW

36.70A.290(2). The Board does not have jurisdiction to decide challenges to project permit applications or site-specific land use decisions, because such decisions do not qualify as comprehensive plans or development regulations. RCW 36.70A.030(7); RCW 36.70B.020(4); *Woods*, 162 Wn.2d at 610.

■ ■ ¶10 Comprehensive plans and development regulations form the foundation for subsequent project review. RCW 36.70B.030(1). Such plans and regulations determine the density of residential development in urban growth areas; the type of land uses permitted at the site, including uses such as planned unit developments and conditional and special uses; and the availability and adequacy of public facilities, if the plan provided for funding of those facilities. RCW 36.70B.030(2)(a)-(c). "Comprehensive plan" is defined in the GMA:

> "Comprehensive land use plan," "comprehensive plan," or "plan" means a generalized coordinated land use policy statement of the governing body of a county or city that is adopted pursuant to this chapter.

RCW 36.70A.030(4). The GMA also describes the mandatory elements of a comprehensive plan as inclusive of a future land use map; planning elements; and descriptive text covering objectives, principles, and standards used to develop the comprehensive plan. RCW 36.70A.070. Comprehensive plans serve as guides or blueprints to be used in making land use decisions. *Woods*, 162 Wn.2d at 613. And, the comprehensive plan may include the adoption of sub-area plans that "clarify, supplement, or implement jurisdiction-wide comprehensive plan policies." RCW 36.70A-.130(2)(a)(i); RCW 36.70A.080(2).

¶11 The GMA also defines "development regulations":

> "Development regulations" or "regulation" means the controls placed on development or land use activities by a county or city, including, but not limited to, zoning ordinances, critical areas ordinances, shoreline master programs, official controls,

planned unit development ordinances, subdivision ordinances, and binding site plan ordinances together with any amendments thereto. *A development regulation does not include a decision to approve a project permit application*, as defined in RCW 36.70B.020, even though the decision may be expressed in a resolution or ordinance of the legislative body of the county or city.

RCW 36.70A.030(7) (emphasis added). Development regulations under the GMA expressly exclude a city's decision to approve a project permit application, making clear that such project permit decisions fall outside the scope of the Board's jurisdiction. *See Feil*, 172 Wn.2d at 378.

¶12 A "project permit application," in turn, is defined within chapter 36.70B RCW ("Local project review") as:

any land use or environmental permit or license required from a local government for a project action, including but not limited to building permits, subdivisions, binding site plans, planned unit developments, conditional uses, shoreline substantial development permits, site plan review, permits or approvals required by critical area ordinances, site-specific rezones authorized by a comprehensive plan or subarea plan, *but excluding the adoption or amendment of a comprehensive plan, subarea plan, or development regulations.*

RCW 36.70B.020(4) (emphasis added); *Feil*, 172 Wn.2d at 378. Thus, a project permit application is not a development regulation. *Davidson Serles*, 159 Wn. App. at 630; RCW 36.70A.030(7). "The items listed under 'project permit application' are specific permits or licenses; more general decisions such as the adoption of a comprehensive plan or subarea plan are not approvals of project permit applications." *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 179, 4 P.3d 123 (2000).

¶13 Stated simply, if the 2010 ordinances amended development regulations or the City's comprehensive plan, the Board would properly have exercised its jurisdiction under the GMA. If, on the other hand, the 2010 approval ordinances were permit approvals or site-specific land use

decisions, then they would fall outside the scope of the Board's jurisdiction and would be properly challengeable only in a LUPA petition to the superior court. *Feil*, 172 Wn.2d at 378.

¶14 Black Diamond had enacted both a comprehensive plan and development regulations in 2009. The development regulations, at chapter 18.98 BDMC, constitute Black Diamond's MPD ordinance and provide explicit requirements and criteria for an applicant seeking to obtain an MPD permit. Under RCW 36.70B.030(2)(a), the development regulations established an MPD permit as a type of land use approval, like a conditional use permit, and set up a review process of MPD permits. These development regulations were not challenged before the Board. Once adopted, comprehensive plans and development regulations are presumed valid. RCW 36.70A.320(1); *Woods*, 162 Wn.2d at 614. TRD does not now assert that the MPD ordinance is defective or in violation of the GMA.

¶15 Yarrow Bay submitted its MPD permit applications for the Villages and Lawson Hills MPDs pursuant to chapter 18.98 BDMC criteria and with the comprehensive plan, as required under RCW 36.70B.030(1). The applications were processed as permits, found to be consistent with the 2009 MPD ordinances, and approved by the City by ordinance.

¶16 The Board asserted jurisdiction based on three central points. First, it relies on this court's opinion in *Davidson Serles*, 159 Wn. App. 616. In that case, appellant Davidson Serles & Associates similarly contended that jurisdiction over its challenge to City of Kirkland, Wash., Ordinance no. 4172 (2008) should have rested with the superior court rather than the Board. *Id.* at 629. The ordinances provided details relating to the development of an 11.5 acre urban parcel in the heart of the city of Kirkland. It argued that the ordinance contained design guidelines that were not development regulations subject to the Board's jurisdiction. *Id.* at 629. The *Davidson Serles*

court examined the substance of the ordinance and concluded that it was not a project permit in its own right. *Id.* at 630-31. This was based primarily on the fact that it anticipated future project permit applications and provided additional guidance for the review of such permits. *Id.* The court also noted that the ordinance would work in concert with the already established municipal code to regulate future development. *Id.* at 630. It stated:

> Ordinance No. 4172, which incorporates the "Kirkland Parkplace Mixed Use Development Master Plan and Design Guidelines" into the Kirkland Municipal Code, provides the design review board with an additional set of design guidelines with which to review development permits. [Kirkland] Ordinance No. 4172; KIRKLAND MUNICIPAL Code 3.30.040. The ordinance therefore contemplates that specific project permits will be sought in the future. The ordinance contains "controls placed on development or land use activities," RCW 36.70A.030(7), by the City but is not itself a specific "project permit," RCW 36.70B.020(4). The design guidelines were enacted to guide the development of Parkplace, and compliance with the design guidelines is required in order for a developer to obtain increased building heights and reduced setbacks. Ordinance No. 4172 controls height requirements and other aspects of development within the Parkplace area. The design guidelines are "supplemental, not a substitution" to the City's municipal code and standard zoning regulations.

*Id.* at 630-31 (footnote omitted). This court was not persuaded by Davidson Serles's argument and ultimately concluded:

> Ordinance No. 4172 is more similar to a zoning ordinance or planned unit development ordinance than to a specific permit. This ordinance is a development regulation within the scope of the GMA.

*Id.* at 631.

¶17 The Board relies on this analysis to support its assertion of jurisdiction. There are similarities in the nature of the additional levels of detail in the ordinances at

issue. But, the *Davidson Serles* comparison of those details
to a zoning ordinance, rather than a site-specific rezone as
in *Woods*, and to the planned unit development ordinance,
such as Black Diamond adopted in 2009, should have
apprised the Board that *Davidson Serles* is inapplicable.
*Woods*, 162 Wn.2d at 604. In *Davidson Serles*, by contrast,
the earlier "design guidelines" did not provide for a permit
or a permit application process. And, this court relied on the
fact that there were no permits at issue in that case at all.

¶18 Second, the Board points out that the 2009 MPD
ordinance was broad and very general. The Board reasons
that the 2010 MPD approval ordinances "have the charac-
teristics of a [subarea] plan, or, more precisely, amendment
and adoption of development regulations for a subarea
plan." Subarea plans "clarify, supplement, or implement
jurisdiction-wide comprehensive plan policies." RCW 36-
.70A.130(2)(a)(i); RCW 36.70A.080(2). And, the definition
of a "project permit" expressly excludes "the adoption or
amendment of a comprehensive plan, subarea plan, or
development regulations." RCW 36.70B.020(4). The Board
points to several allegedly forward-looking regulatory con-
trols established by the approval ordinances, as evidence
that the ordinances were subarea plans. For example, the
Board notes that each ordinance adopted a new land use
plan map and deferred certain development determinations
to later processes, including the adoption of height limits;
specific densities; and uses that would be allowed, condi-
tional, or prohibited in each land use district.[2]

¶19 However, the Board fails to acknowledge that under
the provisions of the 2009 MPD ordinance, permit applica-

[2] The Board also suggests the sheer size and magnitude of the project supports
the conclusion that the 2010 approval ordinances looked more like planning or
zoning actions, rather than permitting actions. But, no case has held that size is
a factor, let alone decisive. *Woods* involved a site-specific rezone of 250 acres and
held a permit was not reviewable under the GMA. 162 Wn.2d at 614. *Davidson
Serles* involved merely 11.5 acres and the challenged ordinance was held to be
zoning reviewable under the GMA, not a permit. 159 Wn. App. at 621-22, 631.
What matters is that the ordinances here approved permits, site-specific land use
decisions under statute.

tions must include, among other things, a set of master plan drawings showing the types, generalized locations, and densities of proposed residential and nonresidential development; a map drawn to scale showing property boundaries and existing features; a projected phasing plan and development time schedule; a fiscal analysis of the short- and long-term impacts of the project on the city; and a narrative description of the intended residential density. BDMC 18.98.040(A)(1)-(6), (17). And, TRD does not assert that Yarrow Bay's MPD permit applications failed to comply with the requirements set forth in the 2009 MPD ordinance or that approval of the permits by ordinance was procedurally improper under the 2010 MPD approval ordinances. Thus, the only way that the MPD permits here could violate the GMA is if the MPD ordinance violated the GMA.

¶20 The Supreme Court addressed a similar jurisdictional question in *Woods*. *Woods* involved an application to rezone 251 acres. 162 Wn.2d at 603. The court noted that a site-specific rezone is a project permit under RCW 36.70B-.020(4). *Id.* at 610, 613. It stated:

> [A] comprehensive plan or development regulation's compliance with the GMA must be challenged within 60 days after publication. RCW 36.70A.290(2). Once adopted, comprehensive plans and development regulations are presumed valid. RCW 36.70A.320(1). Thus, if a project permit is consistent with a development regulation that was not initially challenged, there is the potential that both the permit and the regulation are inconsistent with the GMA. While this is problematic, the GMA *does not explicitly apply to such project permits* and the GMA is not to be liberally construed.

*Id.* at 614 (emphasis added). This analysis is controlling here. It is undisputed that the 2010 MPD ordinances approved permits and that those permit applications were consistent with the development regulations established in 2009. No one challenged or appealed the 2009 MPD ordinance or the development regulations contained therein as

not conforming to the GMA. Yarrow Bay argues any challenge under the GMA to the 2010 permits approved consistent with the 2009 ordinances constitutes an impermissible collateral attack on the 2009 ordinances. RCW 36.70A-.290(2). We agree. TRD's challenge to the City's permit approval must be under LUPA in superior court, not under the GMA before the Board. *Woods,* 162 Wn.2d at 615-16.

¶21 Third, the Board noted the provision in the application: " 'When there is a conflict between the standards and this Agreement and the provisions of the referenced Black Diamond Municipal Code, this Agreement will prevail.' " Given effect, the Board believed this provision would likely constitute an amendment to the BDMC and the City's development regulations, over which the Board would properly have jurisdiction. Whether this is true, or whether the superior court would have jurisdiction in a LUPA to strike such provision, we need not address. As Yarrow Bay points out, the 2010 MPD approval ordinance reflects the fact that Yarrow Bay withdrew the relevant portion of chapter 13 in its application, where this provision appeared. TRD does not dispute this.

¶22 We hold the 2010 MPD ordinances adopted by the City were project permit approvals. The Board lacked jurisdiction to review these permits. We reverse.

BECKER and SPEARMAN, JJ., concur.

Review denied at 173 Wn.2d 1036 (2012).