# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

TOWARD RESPONSIBLE
DEVELOPMENT, a Washington
not-for-profit corporation; CYNTHIA E.
and WILLIAM B. WHEELER; ROBERT
M. EDELMAN; PETER RIMBOS;
MICHAEL E. IRRGANG; JUDITH
CARRIER; EUGENE J. MAY; VICKI
HARP; CINDY PROCTOR; ESTATE
OF WILLIAM C. HARP,

        Appellants,

        v.

CITY OF BLACK DIAMOND; BD
LAWSON PARTNERS LLC 050510;
BD LAWSON PARTNERS LP 001251;
BD LAWSON PARTNERS LP 050510;
BD LAWSON PARTNERS LP 059999;
BD LAWSON PARTNERS LP 091251;
BD PARTNERS LP 05010; BD
PARTNERS LP 821004; BD VILLAGE
PARTNERS LP 050511; DIAMOND
STAR DEVELOPMENT LLC 247647;
DIAMOND STAR DEVELOPMENT LLC
247654; FRANKLIN DEVELOPMENT
LLC 1N0763; KING COUNTY DNRP
069800; PALMER COKING COAL CO
LLP 020445; and PLUM CREEK
TIMBER 353489,

        Respondents.

No. 69418-9-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: January 27, 2014

GROSSE, J. — Applying the "rule of reason," a Hearing Examiner properly concludes that an environmental impact statement provides a reasonably thorough discussion of the significant aspects of a Master Planned Development's environmental impacts when, as here, the Hearing Examiner's findings are supported by substantial evidence. Additionally, an agency may

properly rely on the use of phased review to defer further analysis of adverse environmental impacts until the time of construction when, as here, specific aspects of the project that would require such analysis are not yet determined. Accordingly, we affirm.

FACTS[1]

In 1996, the city of Black Diamond (City) completed its first Growth Management Act (GMA)[2] Comprehensive Plan, which included a designation for Master Planned Developments (MPD).[3] In 2005, the City adopted MPD ordinances. These ordinances established the MPD zoning district and the standards and MPD permit requirements for parcels that exceed 80 acres.[4]

In 2009, the City adopted a new and updated Comprehensive Plan, designating large areas of the City for MPDs.[5] The City also enacted development regulations in a 2009 MPD ordinance, codified in chapter 18.98 of the City code (BDMC), that were consistent with the new Comprehensive Plan and created an MPD permit and review process for large scale development projects.[6] This ordinance served to update the procedures, requirements, and standards relating to application for, approval of, and amendment to the conditions attached to an MPD, and also created an MPD zoning district, set the standards and the permit process for the review of future MPD permit

---

[1] Citations to the Administrative Record will be listed as "AR" citations.
[2] Chapter 36.70A RCW.
[3] Ordinance No. 599.
[4] Ordinance Nos. 05-779, 05-796.
[5] City of Black Diamond Comprehensive Plan, June 2009 ("Plan").
[6] BDMC 18.98.010(B), 030(A).

applications, and contained generalized policy statements.[7] The City also adopted chapter 18.08 BDMC, which provided for additional procedures for processing permits. These ordinances were not appealed or otherwise challenged under the GMA.

In 2009, BD Village Partners and BD Lawson Partners (collectively Yarrow Bay) sought approval from the City to build two MPDs on land that falls within the City's urban growth area. Yarrow Bay submitted permit applications for two MPD projects known as "The Villages" and "Lawson Hills." The Villages project included 1,196 acres, proposed to be developed with a maximum of 4,800 low, medium, and high density dwelling units, and a maximum of 775,000 square feet of retail, offices, commercial and light industrial development, schools, and recreation and open space.[8] The Lawson Hills project contemplated a maximum of 1,250 low, medium, and high density dwelling units on 371 acres, and a maximum of 390,000 square feet of retail, offices, commercial and light industrial development, schools, and recreation and open space.[9]

As required by the State Environmental Policy Act (SEPA), chapter 43.21C RCW, Environmental Impact Statements (EISes) were prepared by the City under the direction of Steve Pilcher, the designated responsible official overseeing their preparation. Initially, the City agreed that the draft EISes could be prepared by Yarrow Bay's consultants, but later retained Parametrix to peer review the work performed by Yarrow Bay consultants. The final EISes did not

---

[7] See BDMC 18.98.005, .060.
[8] AR 27160.
[9] AR 27332-33.

include review of additional impacts such as traffic queue lengths at specific intersections, mitigation project design, and the potential for an alternate, on-site stormwater pond location. These impacts were instead to be deferred until later stages of development and construction when more specific information about them would be available.[10]

Once the final EISes were completed, a public hearing was scheduled on the two MDP permit applications. At the same time, the EISes were appealed and those appeal hearings were consolidated with the hearing on the MPD permits. After extensive hearings, the Hearing Examiner issued two rulings for each MPD: one that addressed the adequacy of the EISes and one that made recommendations to the Black Diamond City Council (Council) on the permits. The Hearing Examiner concluded that each EIS provided an adequate analysis of environmental impacts and recommended that the Council approve both The Villages and Lawson Hills MDP permits subject to several conditions.[11]

The Hearing Examiner's recommendations were forwarded to the Council for consideration. The Council voted unanimously to approve both permits subject to a number of revised conditions and passed ordinances approving the MPD permits.[12] A citizens group, Toward Responsible Development (TRD), filed a land use petition under the Land Use Petition Act (LUPA), chapter 36.70C, in King County Superior Court appealing both the MDP permits and the Hearing Examiner's determinations that the final EISes were adequate. The superior

---

[10] AR 1225-26, 1235-36, 2084-85, 2475, 2479-80.
[11] AR 24770, 24770-988.
[12] Ordinance Nos. 10-946, 10-947.

court affirmed the MDP permit approvals and upheld the adequacy of the EISes. TRD appeals.

## ANALYSIS

To prevail on a LUPA petition, the party challenging a government entity's land use decision has the burden of establishing that the land use decision was error as set forth in RCW 36.70C.130(1). Among these errors are that the decision was a clearly erroneous interpretation of law, unsupported by substantial evidence, or a clearly erroneous application of law to facts.[13] These are the claimed bases for TRD's challenges to the EIS determinations and the ordinances. In reviewing such decisions, we give "deference to both legal and factual determinations of local jurisdictions with expertise in land use regulation."[14] We also grant deference to the Hearing Examiner's determinations under SEPA.[15]

### I.    Environmental Impact Statement

An EIS is reviewed under the "rule of reason" standard.[16] The "rule of reason" requires only a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences . . . .'"[17] "'The EIS'[s]

---

[13] RCW 36.70C.130(1)(b),(c),(d).
[14] City of Medina v. T-Mobile USA, Inc., 123 Wn. App. 19, 24, 95 P.3d 377 (2004) (recognizing deference standard in RCW 36.70C.130(1) (quoting Timberlake Christian Fellowship v. King County, 114 Wn. App. 174, 180, 61 P.3d 332 (2002)).
[15] RCW 43.21C.090.
[16] Klickitat County Citizens Against Imported Waste v. Klickitat County, 122 Wn.2d 619, 633, 860 P.2d 390 (1993).
[17] Klickitat County Citizens, 122 Wn.2d at 633 (quoting Cheney v. Mountlake Terrace, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976)).

purpose is to facilitate the decision-making process; it need not list every remote, speculative, or possible effect or alternative,"[18] nor evaluate every scenario or conduct a "'worst case analysis.'"[19] Courts review an EIS "as a whole"[20] and "examine all of the various components of [the] agency's environmental analysis . . . to determine, on the whole, whether the agency has conducted the required 'hard look.'"[21] We review SEPA determinations in a land use petition under the clearly erroneous standard as set forth in RCW 36.70C.130(1)(d).

TRD challenges the adequacy of the EISes on several grounds. It contends that the Hearing Examiner erred by analyzing the MPDs as nonproject programmatic actions, rather than project actions, by relying on phased review to defer some detailed analysis until the time of construction, and by concluding that the EISes adequately addressed the impacts on Lake Sawyer and traffic. TRD further contends that the EISes failed to adequately respond to agency comments on the draft EISes.

A.    Project vs. Programmatic Action

TRD contends that the Hearing Examiner erred by characterizing the EISes as "programmatic" rather than project specific and by applying a less

---

[18] Gebbers v. Okanogan County Public Utility Dist. No. 1, 144 Wn. App. 371, 183 P.3d 324 (2008) (citing Klickitat County Citizens, 122 Wn.2d at 641).

[19] East County Reclamation Co. v. Bjornsen, 125 Wn. App. 432, 442 n.9, 105 P.3d 94 (2005) (quoting Solid Waste Alternative Proponents (SWAP) v. Okanogan County, 66 Wn. App. 439, 447-48, 832 P.2d 503 (1992)).

[20] Save Lake Washington v. Frank, 641 F.2d 1330, 1336 (9th Cir. 1981).

[21] Webster v. U.S. Dep't of Agriculture, 685 F.3d 411, 421-22 (4th Cir. 2012) (first and second alterations in original) (quoting National Audubon Soc'y v. Department of Navy, 422 F.3d 174, 186 (4th Cir. 2005).

rigorous review standard. The Washington Administrative Code (WAC) 197-11-442 addresses the contents of EISes on nonproject proposals:

(1)    The lead agency shall have more flexibility in preparing EISs on nonproject proposals, because there is normally less detailed information available on their environmental impacts and on any subsequent project proposals. . . .

(2)    The lead agency shall discuss impacts and alternatives in the level of detail appropriate to the scope of the nonproject proposal and to the level of planning for the proposal. . . .

(3)    If the nonproject proposal concerns a specific geographic area, site specific analyses are not required, but may be included for areas of specific concern. The EIS should identify subsequent actions that would be undertaken by other agencies as a result of the nonproject proposal, such as transportation and utility systems.

WAC 197-11-704 distinguishes between "project" and "nonproject" actions as follows:

(a) **Project actions.** A project action involves a decision on a specific project, such as a construction or management activity located in a defined geographic area. Projects include and are limited to agency decisions to:
(i)License, fund, or undertake any activity that will directly modify the environment, whether the activity will be conducted by the agency, an applicant, or under contract.
(ii)Purchase, sell, lease, transfer or exchange natural resources, including publicly owned lands, whether or not the environment is directly modified.

(b) **Nonproject actions.** Nonproject actions involve decisions on policies, plans, or programs.
(i)The adoption or amendment of legislation, ordinances, rules, or regulations that contain standards controlling use or modification of the environment;
(ii)The adoption or amendment of comprehensive land use plans, or zoning ordinances;
(iii)The adoption of any policy, plan or program that will govern the development of a series of connected actions (WAC 197-11-060), but not including any policy, plan, or program for which

approval must be obtained from any federal agency prior to implementation;

(iv)Creation of a district or annexations to any city, town, or district;
(v)Capital budgets; and
(vi)Road, street, and highway plans.

The Hearing Examiner concluded that review of the MPDs amounted to a project action:

> The parties appear to agree that the MPD review is a nonproject as opposed to a project action. The [Hearing] Examiner also agrees that MPD review qualifies as nonproject action because it involves "regulations that contain standards controlling use or modification of the environment" as opposed to "a construction or management activity located in a defined geographical area." See WAC 197-11-704(2)(a) and (b). An agency has more flexibility in preparing an EIS on a nonproject action "because there is normally less detailed information available on their environmental impacts and on any subsequent project proposals." WAC 197-11-442. The SEPA Appellants have pointed out that the MPD does have some characteristics of a project action due to the specificity of improvements proposed and, in a broader sense, because the review is treated as a quasi-judicial proceeding. This is quite true, but hybrid actions are covered in the nonproject regulations that specify that the level of detail must be appropriate "to the scope of the nonproject proposal and to the level of planning for the proposal.["] Id. Given these requirements, the level of detail is expected to be comparatively high for project specific impacts.[22]

We agree with the Hearing Examiner's characterization of the MPD permit approval as a nonproject action, or at the very least, a hybrid action. As Yarrow Bay points out, the MPD permits are not permits for clearing, grading, subdivision, or construction of any kind; rather, they are initial project permits that set forth a site plan for development. Accordingly, the Hearing Examiner did not err by treating the action as "nonproject" and applying a more flexible standard.

---

[22] AR 24594.

TRD also contends that the MPD permits should be treated as project actions based on this court's determination in an earlier related appeal that the MPD permits were "project permit approvals." This earlier decision involved TRD's appeal of the MPD permits to the Growth Management Hearings Board (Board) under the GMA,[23] which was filed at the same time it filed the current LUPA appeal in superior court.[24] This court held that the Board lacked jurisdiction to review the permits under the GMA because they did not qualify as decisions involving comprehensive plans and development regulations, to which the Board's jurisdiction was limited. Rather, this court concluded they were approvals of a "project permit" under RCW 36.70B.020(4), which specifically excludes decisions involving comprehensive plans, subarea plans, and development regulations, and is defined as

> any land use or environmental permit or license required from a local government for a project action, including but not limited to building permits, subdivisions, binding site plans, planned unit developments, conditional uses, shoreline substantial development permits, site plan review, permits or approvals required by critical area ordinances, site-specific rezones authorized by a comprehensive plan or subarea plan, but excluding the adoption or amendment of a comprehensive plan, subarea plan, or development regulations except as otherwise specifically included in this subsection.[25]

---

[23] BD Lawson Partners, LP v. Central Puget Sound Growth Mgmt. Hearings Bd., 165 Wn. App. 677, 269 P.3d 300 (2011), review denied, 173 Wn.2d 1036, 277 P.3d 669 (2012).

[24] The LUPA case was stayed pending the GMA appeal.

[25] As this court explained, because the permit approvals did not amend development regulations or the City's comprehensive plan but were processed as permits consistent with the 2009 MPD ordinances, the only way the permits could violate the GMA is if the MPD ordinance violated the GMA. BD Lawson, 165 Wn. App at 689. Noting that these regulations were never challenged under the GMA, this court agreed with Yarrow Bay that "any challenge under the GMA

But that determination decided the issue of jurisdiction over review of the MPD permits; it does not address the issue here, which is whether a more flexible standard applies to review of an EIS for an MPD permit. As discussed above, this depends on whether the MPD permit is characterized as a "project" or "nonproject" action as defined in the specific regulations relating to EIS review, and the Hearing Examiner properly reviewed it as a nonproject action.

B.    Phased Review

TRD further contends that the Hearing Examiner erred by considering the EISes as part of a "phased" environmental review and allowing the deferral of certain detailed environmental analyses until the time of actual construction. The EIS regulations provide for "phased review" as follows in WAC 197-11-060(5):

> (b) Environmental review may be phased. If used, phased review assists agencies and the public to focus on issues that are ready for decision and exclude from consideration issues already decided or not yet ready. Broader environmental documents may be followed by narrower documents, for example, that incorporate prior general discussion by reference and concentrate solely on the issues specific to that phase of the proposal.
>
> (c) Phased review is appropriate when:
>      (i)The sequence is from a nonproject document to a document of narrower scope such as a site-specific analysis (see, for example, WAC 197-11-443); or
>      (ii)The sequence is from an environmental document on a specific proposal at an early stage (such as need and site

---

to the 2010 permits approved consistent with the 2009 ordinances constitutes an impermissible collateral attack on the 2009 ordinances," and concluded, "TRD's challenge to the City's permit approval must be under LUPA in superior court, not under the GMA before the Board." BD Lawson, 165 Wn. App. at 690.

10

selection) to a subsequent environmental document at a later stage (such as sensitive design impacts).

(d) Phased review is not appropriate when:
    (i) The sequence is from a narrow project document to a broad policy document;
    (ii) It would merely divide a larger system into exempted fragments or avoid discussion of cumulative impacts; or
    (iii) It would segment and avoid present consideration of proposals and their impacts that are required to be evaluated in a single environmental document under WAC 197-11-060(3)(b) or 197-11-305(1); however, the level of detail and type of environmental review may vary with the nature and timing of proposals and their component parts.

. . . .

(g) Where proposals are related to a large existing or planned network, such as highways, streets, pipelines, or utility lines or systems, the lead agency may analyze in detail the overall network as the present proposal or may select some of the future elements for present detailed consideration. Any phased review shall be logical in relation to the design of the overall system or network, and shall be consistent with this section and WAC 197-11-070.

Our courts have approved of phased review in cases where it is difficult to assess the full impact of a project at the time. For example, in <u>Cathcart-Maltby-Clearview Community Council v. Snohomish County</u>, the court held that even though the EIS was a "bare bones" presentation of impacts, a large scale residential development project was an appropriate candidate for phased review:

Given the magnitude of the project, the length of time over which it will evolve, and the multiplicity of variables, staged EIS review appears to be an unavoidable necessity. At this point, an exhaustive EIS is impracticable in light of the difficulty of determining in the abstract, for a period of 25 years, such things as the rate at which the project will develop, the particular location of the housing units, the growth of the tax base which will support the needed public services, the evolution of transportation technologies, and the evolving socioeconomic interests of the prospective population.[26]

---

[26] 96 Wn.2d 201, 208, 210, 634 P.2d 853 (1981).

But the court also made clear that approval of the initial EIS "does not relieve the developers from ultimately complying with all SEPA requirements."[27] Rather, "[a]s the data becomes available or, at the latest, when sector plan approval is sought, the secondary and cumulative impacts on the entire affected area . . . must be quantitatively assessed and the costs of mitigating them identified."[28]

Similarly here, phased review is appropriate. The approved deferred environmental review applies to those aspects of construction that can only be adequately analyzed after additional detail is known. This includes construction traffic impacts, traffic queue lengths at not yet constructed intersections, and the potential for an alternate, on-site stormwater pond location.[29] When this information becomes available, Yarrow Bay must comply with all SEPA requirements and provide a supplemental EIS that quantitatively assesses the secondary and cumulative impacts on the entire affected area and identify the

---

[27] Cathcart, 96 Wn.2d at 211.

[28] Cathcart, 96 Wn.2d at 211(citation omitted).

[29] See testimony at AR 2474-75 (potential impacts from construction hauling best addressed at project stage); AR 1219 (not reasonable or cost effective to assess queue length calculations for project build-out in the year 2025); AR 1226 (needed turn lanes can be identified, not appropriate at this stage to assess sizing and length of turn lanes when construction not until 5, 10, 15 years, makes sense when it is closer to design and construction); AR 2084 (if off-site stormwater infiltration pond not permitted, potential impacts of an alternate on-site pond would require additional analysis after specific locations are determined); AR 2474 (potential impacts of constructing sewer system more accurately assessed at project specific phase).

costs of mitigating them.[30] TRD fails to show that the Hearing Examiner's approval of the use of phased review is clearly erroneous.

C.    Lake Sawyer Impacts

TRD contends that the EISes failed to adequately address the impacts of the MPDs on Lake Sawyer, which has a history of water quality issues. Lake Sawyer's water quality problems were caused in part by failing septic systems in the Lake Sawyer watershed and, in 1981, the City responded by constructing a sewage treatment plant that discharged treated effluent into wetlands. The effluent, however, ultimately reached Lake Sawyer, causing phosphorous levels to increase and create algae blooms that rendered the lake unusable by the public. The problem was eventually corrected in 1992 but it took several years for water quality to reach acceptable levels of phosphorous.[31]

As a result, the Washington State Department of Ecology (DOE) listed Lake Sawyer as an impaired water body subject to the federal Clean Water Act, which requires that a limit be set for the amount of phosphorous allowed into the water. This limit is known as the total maximum daily load (TMDL). In 1993, the Environmental Protection Agency (EPA) set the TMDL for phosphorous in Lake Sawyer at 715 kilograms per year, an in-lake concentration of 16 micrograms/L.[32]

In 2000, King County prepared the Lake Sawyer Management Plan (LSMP), which sought to complete a study begun in 1989 through 1990 to

---

[30] Cathcart, 96 Wn.2d at 211; see also WAC 197-11-405(4)(a),(b) (requiring a supplemental EIS when there are either "substantial changes" to a proposal or "significant new information" indicating probable environmental impacts).
[31] AR 24669.
[32] AR 20760.

assess the impact of the water treatment plant diversion on water quality, update the lake's nutrient and water budgets, and evaluate restoration alternatives to protect water quality. It also included a detailed projection of phosphorous levels at full build-out of the Lake Sawyer watershed, with and without recommended mitigation. The LSMP showed a phosphorous concentration of 31 micrograms/L for build-out with "watershed controls" and 37 micrograms/L for build-out with "internal load control."[33]

In 2009, DOE released a follow-up plan, the Lake Sawyer Total Phosphorous Maximum Daily Load Water Quality Implementation Plan (Implementation Plan), which provided for corrective actions to address sources of phosphorous pollution in the lake and the surrounding watershed.[34] The Implementation Plan also contemplated the City's adoption of the 2005 Stormwater Management Manual for Western Washington and concluded that the adoption of the manual and a monitoring program would result in meeting the TMDL.[35] The Implementation Plan also included data showing that phosphorous levels had actually decreased by 2007, approximately 50 percent below the TMDL.[36]

> The EISes discussed the phosphorous levels in Lake Sawyer as follows:
>
> Historically, untreated sewage from septic tanks and drainfields drained to Lake Sawyer, partially contributing to existing elevated phosphorous concentrations in the lake. In 1992, all wastewater discharge from Black Diamond's lagoons to Lake Sawyer was

---

[33] AR 24670.
[34] AR 24670.
[35] AR 24671.
[36] AR 15399 (figure 5 shows a graph indicating levels in 2007 at .08 micrograms).

terminated, although numerous septic drainfields still surround the lake. In 1993, the EPA set a maximum mean summer total phosphorous concentration limit of 16 µg/L (.016 mg/L). Although the Department of Ecology has determined that some short term noncompliance with the total phosphorous concentration limit may exist, it has concluded that Lake Sawyer appears to be meeting the limit as a long term average. Existing elevated total phosphorous concentrations in the lake stem from several sources: release from sediments during seasonal turnovers (19 percent); flow from Rock Creek basin (35 percent); flow from Ravensdale Creek basin (17 percent); the immediate Lake Sawyer subbasin (12 percent); septic tanks (8 percent); and input from aquatic plants, groundwater, and the air (9 percent).

King County completed the Lake Sawyer Management Plan in 2000 and concluded that the lake is currently mesoeutrophic. The Lake Sawyer Management Plan has a goal of maintaining the lake's mesoeutrophic state while accommodating future population growth through 2030.[37]

. . . .

Nutrients of concern in stormwater consist largely of nitrogen and phosphorous and often originate from fertilizers used on lawn and landscaping, and from exterior use of detergents. Nitrogen and phosphorous can also enter waterbodies from erosion during construction and from bed movement in streams. Lake Sawyer currently has a 303(d) listing for phosphorous, and both it and Jones Lake are potential candidates for eutrophication based on increased nutrients resulting from development.[38]

The Hearing Examiner found that the EISes failed to adequately disclose potential phosphorous impacts to Lake Sawyer,[39] but concluded that the LSMP and Implementation Plan "[p]rovide a [h]ighly [c]redible and [t]horough [r]eview of [p]hosphorous [i]mpacts and [c]ontrol for [d]evelopment in the [e]ntire Lake Sawyer Watershed,"[40] both MDP projects are within the phosphorous loading

---

[37] AR 20760.
[38] AR 20768.
[39] AR 24671.
[40] AR 24669 (boldface omitted).

assumptions employed by the LSMP,[41] and both MDPs adequately mitigate phosphorous impacts to Lake Sawyer.[42]

TRD first contends that the Lake Sawyer analysis was inadequate because it failed to disclose the potential impacts of phosphorous loading into Lake Sawyer. The Hearing Examiner found that this information was lacking but concluded that this omission alone was not a basis to invalidate the entire EIS:

> Neither [T]he Villages EIS or the Lawson Hills EIS adequately identifies the impacts associated with reaching eutrophic status, e.g., the health hazards, beach closures, harm to endangered fish and aesthetic blight. . . . These omissions are difficult to justify given that 65% of [T]he Villages sand [sic] 100% of Lawson Hills drains into Lake Sawyer.
>
> Given the prominence that Lake Sawyer water quality plays in the Black Diamond community, the significance of phosphorous impacts and the uncertainty in the science backing [sic] Implementation Plan, it was unreasonable for the EIS to fail to warn of the specific problems that could arise from phosphorous contamination of Lake Sawyer. Given the large amount of development involved in the MPD proposals, the information on specific impacts could spur decision makers into advocating for updated modeling [sic] the LSMP or a greater commitment to implementing the regional mitigation measures identified in the Implementation Plan. Given the overall scope and context of the EIS, the failure to include these specific impacts cannot by itself justify a finding of inadequacy for the entire document, especially given that the reference to eutrophication in both documents does provide inquiry notice to persons concerned about water quality.[43]

TRD fails to show that the Hearing Examiner's conclusion was clearly erroneous. Applying the rule of reason, it was not error to conclude that omission of the full extent of these impacts cannot alone justify invalidating the entire EIS. At the

---

[41] AR 24673.
[42] AR 24674.
[43] AR 24672.

very least, it did identify Lake Sawyer as a "potential candidate[] for eutrophication based on increased nutrients resulting from development."[44]

TRD further contends that the EISes' failure to provide information about the actual quantity of phosphorous that likely will reach the lake at full build-out of the MPDs renders the EISes inadequate because this information is "essential" in assessing the projects' impacts on Lake Sawyer, which TRD contends is "at a tipping point."[45] But as the Hearing Examiner concluded:

> On the utility of additional information, Mr. Zisette testified that the Applicant failed to determine how much phosphorous the MPDs would add to Lake Sawyer. He noted that the Applicant could have easily made this determination since it had data on both projected stormwater volumes and phosphorous concentrations. The Applicant did not rebut this testimony and the Examiner finds that the phosphorous loading would not have been unreasonably difficult to compute. However, this additional information would not have provided anything of significant use to the decision maker. As ably demonstrated by Mr. Zisette, there is no question that under the modeling of the LSMP that the MPD phosphorous loading would exceed TMDL, no matter what amount of phosphorous was generated by the projects.[46]
>
> . . . .
>
> Of course, with more work the Applicant could recalibrate the LSMP model to include current lake conditions, the Applicant's adjustments to the drainage basins and the benefits of the 2005 stormwater manuals. In short, the Applicant would prepare its own LSMP. The resulting information could indicate how close the MPDs will bring Lake Sawyer to TMDL and what the Applicant's proportionate share of phosphorous loading would have to be in order to keep full build-out below TMDL. The price of this additional information is to hold the Applicant to a different standard than the watershed standards developed in the LSMP and the Implementation Plan. . . . . [T]he reliance of the Applicant upon the LSMP, instead of its own calculations, provides a reasonably

---

[44] AR 20768.
[45] Appellant's Brief (AB) at 47 (boldface omitted).
[46] AR 24678.

17

thorough discussion of stormwater impacts to Lake Sawyer as required for an adequate EIS.[47]

Again, applying the rule of reason, TRD fails to show that the Hearing Examiner's conclusion was clearly erroneous. The analysis reasonably disclosed that phosphorous loading resulting from MPDs would exceed the TMDL and identified reasonable mitigation measures in line with DOE standards. While it certainly failed to identify by precisely how much the TMDL would be exceeded, this lack of specific information alone does not render the entire EIS inadequate. Indeed, WAC 197-11-080(3)(a) and (b) permits agencies to proceed in the absence of "vital information" when information relevant to adverse impacts is either "essential to a reasoned choice among alternatives, but is not known, and the costs of obtaining it are exorbitant " or "important to the decision and the means to obtain it are speculative or not known," and provides that in such cases,

> the agency shall weigh the need for the action with the severity of possible adverse impacts which would occur if the agency were to decide to proceed in the face of uncertainty. If the agency proceeds, it shall generally indicate in the appropriate environmental documents its worst case analysis and the likelihood of occurrence, to the extent this information can reasonably be developed.

Nor has TRD challenged any findings as unsupported by substantial evidence. While TRD claims that Lake Sawyer is at the "tipping point" to becoming eutrophic (i.e., exceeding 24 micrograms/L),[48] the Hearing Examiner's findings acknowledge "there is still a great deal of uncertainty in predicting

---

[47] AR 24678.
[48] AR 24677.

18

phosphorous loading," noting that the modeling in the LSMP shows levels 84 percent above the TMDL, while the most recent data shows it could be as much as 50 percent below the TMDL.[49] The Hearing Examiner's findings further note that while the EIS relies on the phosphorous loading estimates in the LSMP, "the preponderance of evidence in the record establishes that the LSMP significantly overstates the amount of phosphorous generated by the proposed development."[50]

The Hearing Examiner found that "[t]he record identifies three factors and potentially one more factor that markedly skew the LSMP assumptions to overstate MPD phosphorous loading. No factor was offered into the record to that [sic] understates phosphorous loading."[51] The Hearing Examiner further found that "[t]here is nothing to suggest in the record that the MPD proposals, alone, will push the phosphorous concentration beyond the 24 micrograms/L given the current conditions of Lake Sawyer."[52] The Hearing Examiner noted that TRD's expert testified that as little as a 5 percent increase could push the lake into eutrophic status, but did not explain the basis for his assumption or whether it considered the current state of the lake, as all of his calculations had been based on that identified in the LSMP.[53]

---

[49] AR 24671; AR 24673 (the Implementation Plan shows the 2007 phosphorous concentration at 8 to 9 micrograms/L).
[50] AR 24673.
[51] AR 24674.
[52] AR 24677.
[53] AR 24677.

19

Nor has TRD successfully challenged the Hearing's Examiner's finding that the MPDs "meet the conditions for DOE's finding of TMDL compliance."[54] As the Hearing Examiner concluded, "any conclusion that the MPDs would fail to meet TMDL would be directly contrary to the findings of DOE, made in 2009, that the MPDs would satisfy TMDL."[55] And as the Hearing Examiner noted, the appellants offered nothing to refute DOE's findings.[56]

D.   Traffic Impacts

TRD contends that the EISes' traffic analyses were inadequate by failing to address safety impacts, increase in travel times, construction traffic impacts, and the feasibility of implementing mitigation measures. TRD further contends that the EISes failed to adequately analyze alternatives. We disagree.

The Hearing Examiner recognized that the EISes did not address a number of potential impacts on traffic.[57] The Hearing Examiner further found that the EISes did not provide much detail about alternatives 3 and 4, and instead "merely noted the percentage increase posed by each alternative."[58]

---

[54] AR 24675.

[55] AR 24678.

[56] AR 24676 ("nothing was offered by the Appellants to explain why DOE would reach such a conclusion if there was no reasonable basis for it.").

[57] AR 24615, Findings of Fact (FF) 9 (EIS did not include a detailed analysis of potential queue lengths resulted from increased traffic); AR 24615, FF 10 (EIS did not address individual turning movement failures at the various "legs" of each intersection); AR 24616-18, FF 14, 16 (EIS did not address safety concerns including those faced by bicyclists and pedestrians); AR 24617-18, FF 15 (EIS did not include an analysis or estimate of anticipated increases in travel times); AR 24620, FF 19 (EIS did not assess traffic impacts posed by construction of the proposed projects).

[58] AR 24620, FF 20.

But the Hearing Examiner ultimately concluded that the traffic analysis was adequate:

> Although many facets of the transportation analysis could have been better, the choices made by Parametrix are all within the parameters of reasonably justified professional judgment, especially given the substantial weight that must be given to the SEPA Responsible Official's determination that the analysis is adequate. The FEIS [(final EIS)] contains a reasonably thorough discussion of the significant adverse transportation impacts of the proposed project at the programmatic level of analysis. However, the use of a regional model to project local traffic impacts, the divergence in the effect of modeling assumptions, along with concern related to the effect of the choice of models on potential impacts and mitigation will lead the Hearing Examiner to recommend additional mitigation measures based on the outcome of this subsequent study in the MPD.[59]

TRD first contends that the EISes' failure to address safety impacts renders it inadequate. The Hearing Examiner concluded:

> While the FEIS did not identify safety concerns as a probable significant adverse impact, the Appellants did not present evidence that these issues could be adequately addressed at this higher level review. It is reasonable to conclude that decision-makers would recognize that vehicle accidents will increase proportionately with increased traffic volumes.[60]

The Hearing Examiner also made findings recognizing the difficulty of predicting safety impacts without evaluating the particular configuration of a high-accident location.[61] TRD does not assign error to these findings. Accordingly, they are

---

[59] AR 24620.

[60] AR 24620, FF 2.

[61] Finding of Fact 14 cites Parametrix' expert John Perlic's testimony: "Mr. Perlic noted while some of the safety impacts are mitigated by the improvements called for in the FEIS, the randomness of the accidents makes it difficult to predict and impose more specific mitigation that would decrease the risk. He further testified there is no known way to analyze safety impacts except to evaluate the particular configuration of a high-accident location." AR 24617.

verities on appeal and support the Hearing Examiner's conclusions. TRD fails to show that the conclusions are clearly erroneous.

TRD also contends that the EISes' traffic impact analysis was inadequate because it failed to analyze travel times and instead only analyzed intersection levels of service (LOS). The Hearing Examiner concluded that it was not necessary for the EISes to discuss anticipated increases in travel times due to increased traffic and that the LOS analysis "is the more customary manner to address traffic issues."[62] The Hearing Examiner further concluded that the EISes contained "a reasonable discussion of the impacts resulting from increased traffic volumes and decreased levels of service."[63] As the City notes, these conclusions are supported by substantial evidence, including testimony from TRD's traffic expert, city of Maple Valley's traffic expert, and Parametrix's expert.[64]

TRD further contends that the EISes failed to disclose "the true extent of LOS failures," by omitting an AM peak hour analysis and an analysis of individual intersection legs. The Hearing Examiner concluded that "[u]se of the PM peak hour analysis was sufficient to establish necessary mitigation for traffic increases," citing testimony from Parametrix's expert that it is customary to use the highest travel hour to account for worst-case traffic scenarios.[65] The Hearing Examiner also concluded that "[a]nalysis of whole intersection failure was sufficient to establish necessary mitigation," citing testimony from both TRD's

---

[62] AR 2462, CL 3.
[63] AR 24621, CL 3.
[64] AR 849, 878 (TRD expert Ross Tilghman); AR 1109 (City of Maple Valley expert Natarajan Janarthanan); AR 1218, 1234 (John Perlic from Parametrix).
[65] AR 24621, CL 4.

expert and Parametrix's expert that "it is standard practice to analyze the entire intersection because mitigation is tied to failure of whole intersection."[66] The Hearing Examiner further concluded that examining various legs of each intersection is inappropriate for the EIS itself as this analysis is contained in the Transportation Technical Report.[67] TRD fails to show that the Hearing Examiner's conclusions are not supported by substantial evidence and are clearly erroneous.

Next, TRD contends that the EISes were inadequate by failing to analyze construction impacts. The Hearing Examiner recognized this omission but concluded that "mitigation of such impacts is more appropriately handled at each phase of the project."[68] As the Hearing Examiner explained:

> There is no evidence that addressing these impacts at this stage of environmental review would result in a more effective mitigation. SEPA allows the City to determine the appropriate scope and level of detail of environmental review to coincide with meaningful points in their planning and decision-making processes, and to focus on issues that are ready for decision and exclude from consideration issues already decided or not yet ready. WAC 197-11-060(5). Construction impacts are such issues not ripe for consideration. The City's Engineering and Construction Standards will require a traffic control plan that will address the specific impacts prior to commencement of construction.[69]

TRD fails to show that this conclusion is clearly erroneous. As the Hearing Examiner noted, no evidence was presented showing that addressing impacts at

---

[66] AR 24621, CL 5.
[67] AR 24621, CL 5.
[68] AR 24624, CL 14.
[69] AR 24624, CL 14.

this stage would result in more effective mitigation and TRD points to no such evidence.

TRD also contends that the failure to include an analysis of the feasibility of implementing mitigation measures renders the EISes inadequate. The Hearing Examiner concluded that it was not necessary for the EISes to address the feasibility of implementing mitigation measures, explaining:

> SEPA requires the FEIS to discuss reasonable mitigation measures that would significantly mitigate impacts, and indicate what the intended environmental benefits of mitigation measures are for significant impacts. WAC 197-11-440. The FEIS *may* discuss the economic practicability of mitigation measures *if* there is concern about whether a mitigation measure is capable of being accomplished. Id. It *need not* analyze mitigation measures in detail unless they involve substantial changes to the proposal causing significant adverse impacts, and those measures will not be subsequently analyzed under SEPA. Id. In this case, the measures will be subsequently analyzed, and it would be premature to attempt to analyze the feasibility of implementation of mitigation measures at this juncture. Such an analysis is of limited use given the multitude of other factors that could derail the project. Cost-sharing arrangements may be addressed by development agreements entered into between the developer and City.
>
> These issues are more appropriately addressed later as part of the review of the specific project pieces when the City has the permitting authority to condition the project on implementation of mitigation measures. If level of service impacts mandate mitigation, any development can only proceed if mitigation is actually implemented. While SEPA does not require the FEIS to discuss mitigation measures in detail in all instances, mitigation must be reasonable and capable of being accomplished. If mitigation is determined to be unfeasible at the time the project will be built, then GMA concurrency will prevent the development from proceeding. Consequently, any feasibility analysis at this point would only speculate on whether the development will proceed to completion if approved.[70]

---

[70] AR 24622-23, CL 10.

24

TRD fails to show that this conclusion is clearly erroneous. The Hearing Examiner relies on the relevant regulations addressing mitigation in an EIS,[71] and TRD cites no contrary authority requiring the level of detail it urges.

Finally, TRD challenges the adequacy of the alternatives analysis in the EISes' discussion of traffic impacts, contending that it failed to address safety impacts and did not disclose the number of intersections failing LOS standards. The Hearing Examiner concluded:

> While the FEIS gave short shrift to Alternatives 3 and 4, merely noting the percentage increase posed by each alternative, failure to go into more detail is not fatal to the validity of the FEIS. The SEPA Responsible Official made a determination that the FEIS is adequate. The FEIS provided sufficient information to enable the decision-makers to making [sic] a reasoned choice among alternatives. The issues that Appellants claim should have been addressed in more detail with regard to each alternative, such as safety, hours of commute analyzed, character and travel times are discussed elsewhere herein, and were not necessary for the validity of the FEIS.[72]

TRD fails to show that this conclusion is clearly erroneous. An EIS need only include "[r]easonable alternatives" and they need not be discussed in detail.[73] Here, the EISes identified two specific scaled down alternatives and disclosed the percentage of traffic increases attributable to both. TRD points to no authority requiring the detail it seeks.

---

[71] WAC 197-11-440(6)(a),(c)(iv) (An EIS need only "discuss reasonable mitigation measures that would significantly mitigate," and "*may* discuss their technical feasibility and economic practicability, if there is concern about whether a mitigation measure is capable of being accomplished.") (emphasis added).
[72] AR 24622, CL 9.
[73] WAC 197-11-440(5)(b)(i) ("The word 'reasonable' is intended to limit the number and range of alternatives, as well as the amount of detailed analysis for each alternative.").

E.    Noise Impacts

TRD further contends that the EISes failed to adequately address impacts of construction noise.  The Hearing Examiner concluded:

> The FEIS and its Technical Appendices reasonably disclose, discuss, and substantiate the loudness of construction noise that may be attributable to the proposed development.[74]
>
> . . . .
>
> The Applicant proved that the existing noise levels in the FEIS were sufficiently accurate.[75]
>
> . . . .
>
> Although [The Villages] FEIS does not adequately address noise impacts upon the Harp [property] and potentially the Proctor property, this does not render the entire FEIS inadequate.  The noise appeal was limited to impacts upon the three residences identified in Finding of Fact No. 1. Mitigation and further analysis of noise impacts upon those properties can be handled under the MPD conditions of approval without having any substantial impact upon the noise analysis conducted in the EIS. Further the information in the FEIS was sufficient to notify the decision maker that noise impacts could be severe for some property owners, such as the Harps and Ms. Proctor.[76]

TRD contends that because the Hearing Examiner also concluded that the EISes should have included an assessment of the duration of the noise impacts and mitigation,[77] the Hearing Examiner should have found the EISes inadequate. But as the Hearing Examiner also concluded, mitigation and further analysis of noise impacts "can be handled under the MPD conditions of approval without having any substantial impact upon the noise analysis conducted in the EIS."[78]

---

[74] AR 24610, CL 1.
[75] AR 24611, CL 3.
[76] AR 24612, CL 6.
[77] See AR 24583, 24611.
[78] AR 24612.

As the City contends, an EIS may properly take into account mitigation imposed as part of project permit conditions.[79] In fact, the Council followed the Hearing Examiner's suggestions and imposed detailed noise mitigation and monitoring conditions, including a requirement for development of a separate haul route and a prohibition against hauling on certain existing streets in residential areas.[80]

F.    Responses to Agency Comments

TRD further challenges the adequacy of the EISes on the basis that they failed to respond to critical agency comments of the draft EIS. TRD points to the lack of adequate responses to King County's comments about (1) how a proposed infiltration pond in a rural area may impact the regional Green River to Cedar River trail corridor, (2) the draft EIS's deficient discussion of stormwater impacts, (3) the draft EIS's failure to adequately address potential adverse impacts to rural areas and resource lands per countywide planning policy and county comprehensive plan, and (4) more detail about new local wastewater infrastructure and impacts to local streams, wetlands, soil, public health, and to comments from both King County and Washington State Department of Transportation (WSDOT) about deficiencies in traffic analysis.

As a threshold matter, the City first notes that the Hearing Examiner found that the SEPA appellants never raised the adequacy of the responses to agency comments in their administrative SEPA appeals. Rather, the issue was first

---

[79] See Edwardsen v. U.S. Dep't of Interior, 268 F.3d 781, 790 (9th Cir. 2001); City of Sausalito v. O'Neill, 386 F.3d 1186, 1212-13 (9th Cir. 2004).
[80] AR 27310-11, AR 27478.

27

raised in TRD's posthearing closing brief.[81] Accordingly, the Hearing Examiner concluded, "the failure to respond to DEIS [(draft EIS)] comments on its own is not within the scope of the appeals of this decision."[82] But the Hearing Examiner did clarify that the issue can be a factor if related to an appeal issue that has been timely presented and concluded that "[d]uring the course of this appeal the SEPA [a]ppellants have raised the adequacy of [The Villages] FEIS responses related to issues that they have properly presented, such as transportation and Lake Sawyer water quality."[83] Thus, the issue is properly before this court.

The "rule of reason" applies to claimed failures to respond to agency comments and inconsequential errors must be dismissed as harmless.[84] Applying this rule of reason in Klickitat County Citizens, the court held that the county's failure to respond to specific comments about handling of waste on a draft EIS did not render the EIS inadequate, noting that the county did respond to general comments on handling waste and made some changes to the final EIS as a result.[85]

The Hearing Examiner concluded that "there is nothing in the record to suggest that the City failed to address DEIS comment letters that raised significant adverse environmental impacts that were not adequately addressed in the EIS," but did note that the City's failure to use a localized model "certainly

---

[81] AR 24634-35.
[82] AR 24635 (Citing BDMC 18.08.210[(F)]: "no new substantive appeal issues may be raised or submitted after the close of the time period for filing of the original appeal.").
[83] AR 24635.
[84] Klickitat County Citizens, 122 Wn.2d at 637-38.
[85] Klickitat County Citizens, 122 Wn.2d at 638.

detracts from the reasonableness of its discussion, but not enough to render it inadequate."[86] The Hearing Examiner noted that the city of Maple Valley did, in fact, use a local model and the city's transportation engineer was highly qualified, worked for the city instead of the applicant, and had good reason to use the regional model.[87] Applying the rule of reason, TRD fails to show that the Hearing Examiner's conclusion was clearly erroneous. Additionally, as the City points out, all of the agency comments were addressed in detail during the EIS appeal hearing; thus, any failure to respond amounts to harmless error.

II.    Permit Approval

TRD next challenges the ordinances approving the MPD permits, contending that they are inconsistent with the Comprehensive Plan policies to preserve small town character, violate City code standards for job creation and walkability, and fail to provide adequate mitigation for adverse environmental impacts.

TRD first contends the MPD proposals fail to preserve the City's small town character and natural setting as mandated by the Comprehensive Plan ("Plan"). As TRD points out, BDMC 18.98.080.A.1 provides that an MPD permit will not be approved unless it "complies with all applicable adopted policies, standards and regulations," and BDMC 18.98.010.L lists as one of the purposes of the MPD permit process:

> [To] [p]romote and achieve the city's vision of incorporating and/or adapting the planning and design principles regarding mix of uses,

---

[86] AR 24635, CL 3.
[87] AR 24635, CL 3.

compact form, coordinated open space, opportunities for casual socializing, accessible civic spaces, and sense of community; as well as such additional design principles as may be appropriate for a particular MPD, all as identified in the book Rural By Design by Randall Arendt and in the city's design standards.

TRD also points to references in the Plan to "fundamental principles to retain its small town character," and "[r]etain the natural setting."[88] TRD contends that the MPD applications are contrary to these principles, noting that the development areas will be cleared of all vegetation and graded, and will involve the excavation of six million cubic yards of soil and fill. TRD contends that the result will be a "classic, mega-suburban subdivision development pattern" and "big box retail development" that is inconsistent with the historic small character of Black Diamond and the principles of *Rural by Design*.[89] TRD further contends that the MPD proposal is not a continuation of the City's "incremental development," and does not "control the scale and character" of the development as required by the Plan because it seeks to quintuple the City's current size in 15 years, which is wholly out of character and scale of the existing small town ambience.[90]

In its approval of the MPDs, the Council found that the purpose of BDMC 18.98.010.L was met:

As detailed in Finding No. 2, the Land Use Plan map and the MPD application, [T]he Villages MPD application proposes a mix of residential and commercial type uses, with development located in compact clusters separated by sensitive areas and open space.

---

[88] AB at 79 (emphasis omitted).
[89] AB at 80; see Plan at 7-49 (reference to "sustain[ing] historical community character") (emphasis omitted). TRD cites *Rural By Design's* reference to planning developments to "[f]it within the environment rather than on top of it," and "to nestle into rather than intrude upon its natural setting. . . ." AR 14081.
[90] AB at 81-82; Plan at 5-10, 33.

Parks and schools are proposed to be located on site with a road and trail network to link the residential portions of the project. These will provide opportunities for interaction, socializing and a sense of community. Stands of trees and natural areas are proposed along the main spine road through the project. These natural areas and extensive open space will help preserve rural character.[91]

The Council further found:

The proposed project is generally consistent with the vision statement and the City's development regulations and policies. Further, Page 5-13 of the Comprehensive Plan (Land Use element) discuss the MPD Overlay plan designation. The Villages MPD is also consistent with that section of the Comprehensive Plan.[92]

The Council also concluded:

The most controversial policies at issue concern those pertaining to preservation of small town character. Many parties of interest argued that the Comprehensive Plan policies require preservation of "rural" character. This is incorrect, and would be inconsistent with the Growth Management Act, the City's Comprehensive Plan, and implementing development regulations in any event. As the Hearing Examiner's Recommendation explained, when it comes to density, "the die has already been cast on this issue." The Growth Management Act, [c]hapter 36.70A RCW, requires cities to encourage urban densities in order to promote efficient use of infrastructure and contain urban sprawl. . . . Under the GMA, cities are not permitted to adopt Comprehensive Plan policies requiring certain areas to remain "rural." See, e.g., Final Decision and Order in Robison v. Bainbridge Island, CPSGMHB No. 94-3-0025, at 22-23. In Robison, the Board determined that the City of Bainbridge Island's "Overriding Policy No. 1," which called for the City to "preserve the rural character of the Island" violated RCW 36.70A.020(1) and (2), and remanded the policy to the City for revision (the City excised the word "rural"). As the Board explained, "Compact urban development is not 'rural' land use. . . . [B]ecause Bainbridge Island has chosen to be a city, it must remain cognizant of its duty under the Act to plan for compact urban development within its boundaries as it grows."[93]

---

[91] AR 27249.
[92] AR 27249.
[93] AR 27257 (internal citations omitted) (alteration in original).

The Council noted that it implemented the GMA's mandate to provide for urban densities by adopting the MPD overlay provisions in the Plan, which state that the MPD densities "are intended to be urban in nature" and "will be established as part of the MPD approval process."[94] The Council further noted that the Plan states that all cities are included within the urban growth area that are expected to accommodate urban growth in the next 20 years and that the Plan proposed a "village" environment with residential and economic development.[95] The Council then concluded that it is "not in a position to deny the MPD applications because their densities might be construed as damaging 'rural character,'" but noted that impacts created by those densities "may be (and are) addressed through application of the MPD criteria and conditions of approval imposed . . . ."[96]

The Council also concluded that the Plan's policies do not require preservation of "rural character" even if it was permitted under the GMA. Rather, the Council pointed out that the Plan refers to protection of "small town character," which is accomplished by principles that include compact development.[97] Citing the Plan policies, the Council noted that "it calls for the use of 'techniques that continue the character of compact form,' while design guidelines will help the new, compact development feel like a rural community.

---

[94] AR 27257 (emphasis omitted).
[95] AR 27257.
[96] AR 27258.
[97] AR 27258.

32

This does not mean that the Plan is calling for protection of 'rural character' by limiting density."[98]

As to the policies referenced above by TRD requiring preservation of community character, historic character, natural setting, rural community, small town character, and existing historical development, the Council concluded, "None require rural densities or suggest that they supersede the more specific comprehensive plan policies and state mandates requiring urban densities within the City."[99] Rather, the Council recognized that MPD regulations must be applied to harmonize the urban density requirement with maintaining small town character.[100] While the Council noted that the MPD regulations provide examples of how to accomplish this, including reference to *Rural by Design*, it recognized that it "must apply these specific standards, and may not impose conditions upon the MPDs on some vague 'feeling' that they are necessary to protect small town or rural character, because such terms are highly subjective and difficult to assess."[101]

TRD fails to show that the Council's determinations were not supported by substantial evidence or were clearly erroneous. The City was entitled to deference in construing its own Plan and what is consistent with that Plan.[102] As the Council's findings and conclusions demonstrate, the MPD approvals were

---

[98] AR 27258.
[99] AR 27258.
[100] AR 27258.
[101] AR 27259.
[102] Phoenix Dev. Inc., v. City of Woodinville, 171 Wn.2d 820, 838, 256 P.3d 1150 (2011).

consistent with Plan policies. And while TRD claims that the MPDs are contrary to the Plan's "incremental development" policies, the Plan itself expressly projects at least a quadrupling of the City's population by 2025.[103]

TRD next contends that the ordinances approving the MPDs are invalid because they violate City code job creation requirements set forth in BDMC 18.98.120.C, which provides:

> The MPD shall, within the MPD boundary, or elsewhere within the city, provide for sufficient properly zoned lands, and include sufficient incentives to encourage development as permit conditions, so that the employment targets set forth in the comprehensive plan for the number of proposed residential units within the MPD, will, with reasonable certainty, be met before full build-out of the residential portion of the MPD.

The Comprehensive Plan states:

> The City's employment target is to provide one job per household within the City by the year 2025, which would translate to a jobs target of approximately 6,534 jobs. However, employment projections used in this update are more conservative in order to recognize that the City's population will need to grow first so it provides a larger market base that can attract and support a higher level of commercial development, including the services needed by a larger population.[104]

TRD contends that the Council erroneously relied on a jobs per household target of 0.5 per household, rather than one per household as required by the Comprehensive Plan. The Council acknowledged the Plan's reference to the target of one job per household by 2025, but pointed out that the Plan also recognized that these projections are more conservative and that the Plan's "[e]mployment [t]argets" as shown in Table 5-3 for 2025 show a jobs per

---

[103] AB at 81-82; Plan at 5-29.
[104] Plan at 3-11, 3-12.

household ratio of 0.468.[105] Thus, the Council concluded that the Plan's jobs per household target is actually 0.5 per household:

> Given the Comprehensive Plan's acknowledgement that more conservative targets are being utilized to recognize that population growth must precede employment growth, and in light of the "Employment Targets" specified in Table 5-3 and on page 3-12, the jobs per household target specified by the Comprehensive Plan is 0.5 jobs per household. Applying this standard to [T]he [V]illages MPD, the MPD should include sufficient land either within the MPD boundary or City as a whole, to provide approximately 2,400 jobs (4,800 x 0.5 = 2,400).[106]

The Council then concluded that the code requirement was met:

> Because [T]he Villages MPD is projected to generate 1,365 jobs within [T]he [V]illages MPD boundary, because the City has sufficient zoned land within the City as a whole for 5,761 jobs and because the conditions of approval contain incentives for development of the retail/commercial/light industrial areas, the criterion in BDMC 18.98.120[.]C is met.[107]

TRD fails to show that this conclusion was clearly erroneous or unsubstantiated by the record. As the Council explained, the 0.5 jobs per household target is based on projections set forth in the Plan. As noted above, the City is entitled to deference in interpreting its own Plan and TRD fails to show that this was an unreasonable interpretation.

TRD also argues that approval of the MPD permits violates the walkability standard required by BDMC 18.98.080.A.14, which provides: "School sites shall

---

[105] AR 27271, CL 40(B) ("[T]he Comprehensive Plan includes the City's updated projection for 2,677 new jobs by the year 2025. Table 3-9 characterizes this as 0.5 jobs per household by the year 2025. This is roughly consistent with the Comprehensive Plan's "Employment Targets" shown on Table 5-3, for a year 2025 jobs target of 2,952 jobs (2,525 new jobs) which, when divided by the household target of 6,302 households, is jobs per household ratio of 0.468.").
[106] AR 27271, CL 40(D).
[107] AR 27272, CL 40(G).

be identified so that all school sites meet the walkable school standard set for in the comprehensive plan." TRD contends that despite the Council's recognition that the Plan calls for a half mile walkability standard, it did not impose this requirement for the MPDs. To ensure compliance with BDMC 18.98.080.A.14, the Council imposed a condition to require that "where reasonable and practical, all schools should be located within a half-mile walk of residential areas."[108] The Council noted that the Plan contains no specific "walkable" standard but instead refers to the "ten-minute walk" concept and a goal for 80 percent of City residents to have no more than a half-mile walk from commercial services, employment, or access to transit.[109] TRD fails to show that this conclusion is clearly erroneous or unsubstantiated by the record. The Council's characterization of the Plan's references to walkability standards is accurate and does not require a half-mile walkability standard as TRD contends.

Finally, TRD challenges the MPD permit ordinances on the basis that the Council improperly concluded that significant adverse impacts on Lake Sawyer and traffic would be mitigated. TRD argues that Yarrow Bay was required to show that the MPDs would not cause an increase in phosphorous pollutants reaching Lake Sawyer, referring to the Plan's policy NE-6, which provides:

> The special protection measures noted in NE-5 should evaluate and define "high risk" uses and address the siting of such uses in sensitive aquifer recharge areas. The protection measures should also evaluate and include measures to reduce pollutants loads, including phosphorous discharged to Lake Sawyer.[110]

---

[108] AR 27268, CL 40(B).
[109] AR 27268, CL 40(A).
[110] Plan at 4-25.

But as the City notes, this policy is not a requirement for MPD permit approval as TRD suggests; it is a requirement that the City adopt special protection measures in areas highly susceptible to groundwater contamination as identified in policy NE-5[111] and to evaluate and reduce phosphorous loading into the lake. As discussed above, the City has taken such measures (e.g., adoption of stormwater management manual and monitoring program).

The Council's findings and conclusions further establish that the code requirements for MPD permit approval were satisfied. BDMC 18.98.080.A.2 provides that a permit may not be approved unless "[s]ignificant adverse environmental impacts are appropriately mitigated." The Council concluded that the MPDs satisfied the permit requirement to "identify significant environmental impacts and ensure appropriate mitigation" as follows:

> The MPDs have been subject to extensive and intensive environmental review. The FEIS is supported by hundreds of pages of environmental analysis. The bulk of the hearings on the MPDs was comprised of the testimony of numerous experts addressing the appeals of the FEIS. Through this process several areas of improvement were identified, resulting in Hearing Examiner recommendations for and Applicant offers of extensive additional mitigation, including additional future impact analysis and mitigation. That mitigation, and the requirements for future analysis, are incorporated into the conditions of MPD approval in Exhibit C below. New conditions addressing traffic and noise in particular, will help ensure that all significant environmental impacts are appropriately mitigated.[112]

---

[111] NE-5 provides that such measures must "require businesses that use hazardous chemicals to have containment facilities to capture potential chemical spills, and require the use of best management practices for applying pesticides and fertilizers for business residential and recreational uses." Plan at 4-26.

[112] AR 27246, CL 9.

The Council also concluded that BDMC 18.98.020.B was satisfied, which requires "[p]rotection of surface and groundwater quality both on-site and downstream, through the use of innovative, low-impact and regional stormwater management technologies."[113] The Council's findings cite the City's adoption of the 2005 Ecology Stormwater Management Manual for Western Washington, and the MPD application's stormwater management plan which includes incorporation of low-impact development (LID) techniques.[114] The Council's findings of fact and conclusions of law also refer to its imposition of several conditions of the MPD permit approval, including: requiring identification of mechanisms to integrate LID into the overall design of the MPD; requiring incorporation of additional innovative techniques (e.g., requiring new phosphorous treatment technology if authorized for use by DOE in meeting stormwater manual requirements);[115] requiring Yarrow Bay to identify estimated maximum annual volume of total phosphorous that will be discharged in runoff from the MPD site and that will comply with TMDL for Lake Sawyer, and if the discharged amount exceeds the maximum, to make changes to reduce discharge below the maximum;[116] imposing monitoring requirements;[117] and imposing restrictions on roof types.[118] Again, TRD fails to show that these conclusions are clearly erroneous or are unsubstantiated by the record.

---

[113] AR 27251, CL 18 (boldface and italics omitted).
[114] AR 27251, CL 18(B).
[115] AR 27251, CL 18D(i).
[116] AR 27251, CL 18(D)(ii).
[117] AR 27252, CL 18 (D)(v).
[118] AR 27252, CL 18 (D)(iv).

TRD's contention that traffic and noise impacts were not adequately mitigated is likewise without merit. TRD essentially reasserts its challenges to the EISes on this basis, which as discussed above, lack merit.

We affirm.[119]

WE CONCUR:

---

[119] The respondents' motion to dismiss and appellants' motion to strike are denied. As the prevailing parties, the respondents are awarded their fees pursuant to RCW 4.84.370.